THOMPSON et al., Respondents, v. ANDREWS, Appellant.

(165 N. W. 9.)   ·

(File No. 4112.    Opinion filed November 22, 1917.)

1. **Waters and Water Courses—"Natural Drainage"—"Natural Water Course," Defined.**

Laws 1907, Chap. 134, Sec. 22, as amended by Laws 1909, ·Chap. 102, Sec. 11, provides that owners of land may drain same in the general course of natural drainage, by constructing open or covered drains, discharging same into any natural water course or any natural depression whereby the water will be carried into some natural water course. **Held,** that a natural swale or depression into which plaintiff, by digging an open ditch along the path of a natural ditch and to a depth sufficient to drain a basin on his land, was a "natural water course," within the meaning of said laws, and was the "general course of natural drainage" thereunder, for all water flowing from such basin; it being a proper water course for drainage, as the conformation of the land is such as to give to surface waters flowing from one tract to another a fixed and determinate course so as to uniformly discharge it upon 'the servient tract at a fixed and definite point; it being unnecessary that the force of the water be sufficient to wear out a channel or canal having definite and well-marked sides or banks.

2. **Same—Surface Drainage—Dominant Tenant's Right as Easement—"Common Enemy" Rule, Unrecognized—Civil Law the Basis.**

The dominant tenant's right to drain his land by discharging waters into a natural water course crossing the lands of the servient tenant, was one existing prior to enactment of Laws 1907, Chap. 134, Sec. 22, as amended by Laws 1909, Chap. 102, Sec. 11, and such right is of the nature of an easement. This state never recognized the so-called "common enemy" rule concerning surface drainage, which rule recognizes no natural servitude, but is one the application of which leaves surface waters to be cast back and forth in accord with selfish interests of the respective land owners; but the law of this state and of the former territory is based upon the rule of the civil law, which recognizes that the lower property is burdened with an easement under which the dominant tenant may discharge surface waters over such lower property through such channels

as nature has provided; and said Sec. 22 recognizes such ease-
ment.

**3.  Constitutional Law—Due Process—Easement for Drainage, as
"Property."**

Lands of this state were acquired subject to the laws of
easement of surface drainage; and such easement is "property"
within the meaning of the constitutional provision, declaring
that no person shall be deprived of his property without due
process.

**4.  Constitutional Law—Surface Drainage—Legislative Increase of
Easement Beyond Common Law—Vested Rights of Servient
Estate.**

To attempt by legislation to increase a surface drainage ease-
ment and the consequent burden beyond that existing under
common law, would be an interference with vested rights of
owners of servient estates, and an unwarranted taking of their
property, unless the taking were for a public purpose, accom-
panied by "just compensation as determined by a jury" (Const.,
Art. 6, Sec. 13,) providing that private property shall not be
taken for public use without such compensation.

**5.  Same—Surface Drainage in Course of "Natural Drainage"—
Statutory Provision Construed With Constitution.**

Since the Legislature, in enacting Laws 1907, Chap. 134,
Sec. 22, as amended by Laws 1909, Chap. 102, Sec. 11, author-
izing land owner to drain it in the general course of natural
drainage into any natural water course or natural depression,
whereby it will be carried into some natural water course, and
that when such drainage is wholly upon owners' land he shall
not be liable in damages therefor to any person or corporation,
presumptively intended to enact a valid law, **held**, that by
said section the then existing law was in no manner changed.

**6.  Drainage—Surface Waters—Rights and Burdens of Land Own-
ers—Common Law—Circumstances Varying—Upper Lands,
Drainage From, Recognized.**

The common law of a state may differ from that of other
states, or may even vary from time to time to meet the pecu-
liar, and perchance varying, conditions and circumstances of
the state, and the rights acquired and burdens undertaken
by those settling on or purchasing lands are such as are con-
sonate with the rights and burdens of adjoining land owners;
and where one acquires lands, over which a water course passes
through which upper lands normally dry can be drained in
accord with "the general course of natural drainage," he should
be held to have done so knowing that good neighborliness and
common welfare required him to permit the drainage of such
upper lands through such water courses, if this can be accom-
plished without unreasonable injury to his land.

7. Waters and Water Courses—Surface Drainage—"Surface Waters"—Ponded Waters, Effect.

Waters flowing into a depression or basin on an owners' land are "surface waters," and did not lose their character as such as regards the right of drainage, by remaining ponded in a basis for a time until they disappeared through evaporation or percolation, leaving the soil suited for cultivation.

8. Same—Surface Drainage Through Natural Water Course—Limit of Flow on Servient Estate—Rule.

Even though waters of a basin are surface waters and there is a legal burden upon lower lands to receive such waters through the natural water course crossing such land, the burden and accompanying easement is one that is reasonable, or consonant with good neighborliness; but under such claim of easement the dominant tenant could not rightfully turn upon the servient estates large volumes of water, out of all proportion to capacity of the water course, thus causing serious damage to lower owners' lands.

9. Same—Surface Drainage—Unwarranted Discharge Upon Lower Lands—Injunction Against, After Accumulation Disappeared.

Even though defendant had no right to discharge across plaintiff's land waters accumulated upon his land in a natural basin, owing to the amount thereof, or even though such waters were not "surface waters," and he had no easement authorizing him to so discharge any part thereof, it did not necessarily follow that plaintiffs were entitled to injunctional relief against maintenance of a surface ditch, after the accumulation of water had disappeared.

10. Injunctions—Surface Drainage—Enjoining Flow from Dominant Estate—Relief.

In every case where injunctional relief is sought against unwarranted drainage of waters from a dominant estate, there may arise questions in no manner pertaining to a right of easement; depending upon the facts peculiar thereto. Comparative benefits can properly be considered in determining whether one claiming an injury is entitled to equitable relief by way of injunction.

11. Waters and Water Courses—Surface Drainage—Suit to Enjoin—Unwarranted Ditch or Rainfall, Causing Overflow—Sufficiency of Evidence.

In a suit to enjoin maintenance of a ditch draining a natural basin on defendant's land into a natural water course over plaintiffs' land, the evidence showing that after the basin on the dominant estate was emptied of its waters, plaintiffs suffered little if any damage, until within about three years of the trial, during which time an unusual amount of rainfall occurred, held, that the evidence was sufficient to support a

finding that it was through the opening of the ditch in question that plaintiff's lands were damaged; it appearing that during the said wet seasons other neighboring lands had been too wet to cultivat.e

**12.  Same—Surface Drainage—Suit to Enjoin—Evidence—Burden of Proof.**

The burden of proof was on plaintiffs to show that as much of their lands would not have been rendered unfit for cultivation through flowage of surface waters upon them from parts of the water shed other than the part draining into the dominant tracts, together with the natural overflow from such tracts.

**13.  Same—Surface Drainage—Tillage of Servient Estate, Effect of Drainage Upon—Damage.**

While owners' of servient estates had a right to cultivate their lands, yet if in so doing they plowed up a natural water course and put it into a condition interfering with free flowage of surface waters that in accordance with nature flowed down such course, rendering the lands too wet for tillage, they could not complain of defendant's drainage of the natural basin into such water course unless they could show that through the addition of such waters their damage was materially increased.

**14.  Same—Surface Drainage—Easement Right of Dominant Estate by Artificial Drains Through Natural Water Course.**

The owner of dominant agricultural land, situate in the upper portion of a natural drainage water course or water basin, has in course of and for purposes of better husbandry, a legal easement right, by means of artificial drains or ditches constructed wholly upon his own land, to accelerate and hasten flow of waters and to cast them upon a servient estate lying in the same natural drain water course at the point where nature by means of ravines and depressions has indicated a natural outlet; provided such waters are not collected and cast upon the servient estate in unusual or unnatural quantities; and provided that the surface waters of one natural water shed or basin may not, by means of cutting or removal of natural barriers, be cast upon lower land lying in a different natural drainage course or basin.

Appeal from Circuit Court, Minnehaha County. Hon. JOSEPH W. JONES, Judge.

Action by Austin Thompson and others, against John Andrews, to enjoin defendants from continuing to maintain a drainage ditch draining waters from his land upon lands of plaintiffs. From a judgment for plaintiffs, and from an order denying a new trial, defendant appeals. Reversed.

*Krause & Krause,* for Appellant.

*Bates & Bates,* for Respondents.

(1) To point one of the opinion, Appellant cited: Quinn v, Ry. Co. (S. D.) 120 N. W. 884, 22 L. R. A. (N. S.) 789; Lambert v. Alcorn, 144 Ill. 313, 33 N. E. 53; Hull v. Harker (Iowa) 106 N. W. 629; Alsayer v. Peterson (S. D.) 141 N. W. 391; Fenton, etc., R. R. Co. v. Adams, 221 Ill. 201, 112 Am. St. Rep. 171; Hull v. Harker (Iowa) 106 N. W. 629; Sheehan v. Flynn (Minn.) 61 N. W. 462; Rath v. Zimbleman (Neb.) 68 N. W, 488; Schlader v. Strever (Iowa) 138 N. W. 1105, (read paragraphs 4 and 5); Riggs v. Timmerman et ux. (Wash.) 1916F., L, R. A. 424, and annotations thereof; Gilfillan v. Schmidt (Minn.) 66 N. W. 126; Shaw v. Ward (Minn.) 111 N. W. 671, 1143; Todd v. York County (Neb.) 100 N. W. 299; Aldritt v, Fleischauer (Neb.) 103 N. W. 1084; Anderson v. Henderson, 124 Ill. 164, 16 N. E. 232.

Respondents cited: Farnham on Waters and Water Rights, Secs. 885, 887, 894; Boll v. Ostroot, 25 S. D. 513; Sheker v. Machovec (Iowa) 116 N. W. 1042; Pettigrew v. Evansville, 25 Wis. 223; Peacock v. Slinchcomb (Mich.) 155 N. W. 349; Gregory v. Busch (Mich.) 31 N. W. 90; Butler v. Peck, 16 Ohio St. 336, 88 Am. Dec. 452; Brandenberg v. Ziegler, 62 S. C. 18, 89 Am. St. Rep. 887; Barkley v. Wilcox, 86 N. Y. 140.

(2) To point two of the opinion, Appellant cited: Laws 1909, Ch. 102, Sec. 11; 3 Farnham on Water, pp. 2586, 2620.

(5) To point five of the opinion, Respondents cited: Davis v. Fry, 14 Okla. 340, 2 Ann. Cas. 193, and note. Krupke v. Stockard (Minn.) 115 N. W. 175.

(14) To point fourteen of the opinion, Respondents cited: Anderson v. Drake, 24 S. D. 216; Livingston v. McDonald, 21 Iowa, 160; Sheker v. Machovec (Iowa) 116 N. W. 1042; Kaufman v. Lenker (Iowa) 146 N. W. 823; Gregory v. Busch (Mich.) 31 N. W. 90; Butler v. Peck, 16 Ohio St. 336, 88 Am. Dec. 452.

WHITING, J.  Plaintiffs sought to enjoin defendant from continuing to maintain a ditch whereby he drained waters from his land, which waters were eventually discharged upon and across the lands of plaintiffs. Findings and judgment were for plaintiffs, and defendant appealed.  The general course of the

drainage in the watershed involved in this action is to the south. That part of it which has within it the lands of the parties to this action is about 3 miles in length north and south, and contains something over 1,200 acres. The upper mile of such watershed is about a mile across at its widest part, and contains a tract of some 325 acres, the southeastern part of which is appellant's land. Upon appellant's land there is a low flat tract of some 100 acres, on which there accummulates the surface water coming from all of said 325 acres, but no other waters of any kind. The next half mile of such watershed is less than a half mile in width. South of this the watershed gradually widens until, one-half mile farther south, it reaches the land of one respondent. From here it gradually widens and covers a tract somewhat regular in outline and which is a mile in extent north and south and somewhat more than a mile east and west at the widest place. Respondents' lands all lie within this lower tract. As before noted, the upper mile of such watershed contains some 325 acres. The tract between this and respondents' lands, being a tract one mile north and south, contains about 300 acres. The lower tract contains about 650 acres. These lands are all devoted to agriculture. The slope of appellant's 100-acre tract is to the southeast. It is surrounded by a bank. At the lower side of this tract or basin nature left a ditch through the rim of the bank. This ditch was some 2 feet in depth. Even with this ditch unobstructed there would have to be some 2 feet of water over this basin before any water could overflow through such ditch. It appears undisputed that, when appellant's land was first settled upon some time prior to 1880, this basin was perfectly dry and produced fine crops of hay. During the winter of 1880 and 1881 there was an unprecedented fall of snow. When this melted in the spring this basin was filled. It gradually dried up, but it was at least two or three years before it again became dry. Appellant then broke up this basin and raised crops thereon. About 1894 appellant laid a tile drain underneath the ditch above mentioned, and at a depth sufficient to entirely drain this basin. In 1909, the title having become clogged, appellant dug an open ditch along the patch of the natural ditch and to a depth sufficient to drain such basin; this ditch did not extend beyound his land, but its lower end opened into a natural swale or depression and the waters from the ditch

eventually flowed upon and across respondents' lands. From the lower side of the basin down to where the water first reaches respondents' lands there is a fall of about 25 feet; and between the point where such water enters upon their lands to the point where it leaves same, a distance of some three-fourths of a mile, the fall is 21 feet.

The trial court found that the deeping of the said natural ditch leading from this basin increased the flow of water onto respondents' lands, thus rendering a few acres belonging to each respondent unfit for husbandry. Appellant contends that the damage complained of was not caused by the deeping of such outlet, but was the result of unusual rainfall occurring during the years complained of, and that the same damage would have been suffered even if the said basin had retained the water accumulating therein; he also contends that he had a right, in the nature of an easement, under section 22, c. 134, Laws 1907, as amended by section 11, c. 102, Laws 1909, to drain such basin through such artificial outlet, even though by so doing a greater volume of water was discharged upon the lands of respondents to their damage. Said section 22 reads in part as follows:

"Owners of land may drain the same in the general course of natural drainage, by constructing open or covered drains, discharging the same into any natural water course, or into any natural depression, whereby the water will be carried into some natural water course, or into some drain on the public highway with the consent of the board having supervision of such highway, and when such drainage is wholly upon the owner's land he shall not be liable in damages therefor to any person or persons or corporation."

[1] Among those things which the statute recognizes as essential to this right of drainage are: (1) The water must be discharged into a "natural water course," or into a "natural depression whereby the water will be carried into some natural water course"; (2) The drainage must be "in the general course of natural drainage." The trial court found that:

"The water is not discharged from [appellant's] said ditch into any natural water course; * * * there is no natural water course upon any of said lands over and across which said water runs."

The court did find that the water followed "the general course of drainage" the entire distance from appellant's land down to and across respondents' lands. The term "water course" has come to have two distinct meanings.; the one when referring to that water course in and to which riparian rights may attach, and the other when referring to that water course through which an upper land-owner may discharge water from his land. Quinn v. Railway Company, 23 S. D. 126, 120 N. W. 884, 22 L. R. A. (N. S.) 789. As pertaining to drainage this court in the Quinn case adopted, from Lambert v. Alcorn, 144 Ill. 313, 33 N. E 53, 21 L. R. A. 611, the following description or definition of a water course, to which definition we adhere:

"If the conformation of the land is such as to give to the surface water flowing from one tract to the other a fixed and determinate course, so as to uniformly discharge it upon the servient tract at a fixed and definite point, the course thus uniformly followed by the water in its flow is a water course within the meaning of the rule applicable to that subject. Doubtless such water course can exist only where there is a ravine, swale, or depression of greater or less depth, and extending from one tract onto the other, and so situated as to gather up the surface water falling upon the dominant tract and to conduct it along a defined course to a definite point of discharge upon the servient tract. But it does not seem to be important that the force of the water flowing from one tract to the other has not been sufficient to wear out a channel or canal having definite and well-marked sides or banks. That depends upon the nature of the soil and the force and rapidity of the flow. If the surface water in fact uniformly or habitually flows off over a given course, having reasonable limits as to width, the line of its flow is, within the meaning of the law applicable to the discharge of surface water, a water course."

The course which water took from appellant's land down to and over respondents' lands was a "natural water course" under the above decision and as contemplated by the above statute. It is also clear that such "natural water course" was the "general course of natural drainage" for all water flowing from such basin. It follows that, if appellant had the legal right to free his land of the waters accumulating in such basin, his method of doing so was in strict compliance with the said statute. Respond-

ents do not question but that the method used for discharging water from this basin was a proper method to use. Neither do they question but that appellant had a right to free his land from all water that would flow therefrom through the ditch as nature had left it, but they contend that he had no legal right to deepen such ditch and thus allow water to flow out, which water the evidence shows could not otherwise have reached respond-ents' lands.

[2-5] The question thus presented—as to what water an upper tenant may discharge into a natural water course crossing the lands of a lower tenant—is of the first importance in an agricultural state such as ours, and its answer requires a most careful consideration of the nature, source and extent of the right of drainage of which the upper tenant is possessed. That such a right existed prior to the enactment of said section 22, supra, no one would question. That such right was and is of the nature of an easement is the established law of this state. This state had never recognized the so-called "common enemy" rule relating to the drainage of surface waters—a rule that is absolutely without basis in reason, and whose origin is in much doubt, having been wrongfully credited to the English common law. Farnham on Water and Water Rights, 2591. The "common enemy" rule recognizes no natural servitudes, and is there-fore one under which the disposition of surface water is not con-trolled and regulated in conformity with vested rights or ease-ments appurtenant to property, but one the application of which leaves surface waters a mere shuttlecock, to be cast back and forth in accord with the selfish interest of the upper and lower landowners, thus creating in each case a conflict which, as its logical result, resolves itself to the question whether the upper landowner is able to bring into being an irresistible force or the lower landowner can erect an unsurmountable and immovable bar-rier. The law of this state and of the territory from which this state was created has been at all times based on the rule of the civil law, which is also the rule of the English common law (Farnham on Water and Water Rights, 2587; Quinn v. Railway Co., supra)—that rule which recognizes that the lower property is burdened with an easement under which the owner of the upper property may discharge surface waters over such lower property

through such channels as nature has provided. Section 22, supra, fully recognizes such easement. It follows that the lands of this state were acquired subject to the law of easements for drainage of waters; that an easement is property within the meaning of our constitutional provision declaring that no person shall be deprived of his property without due process is clear. 9 R. C. L. 736. It follows that to attempt by legislation to increase such an easement and the consequent burden beyond that existing under the common law of this state would have been an interference with the vested rights of the owners of every servient estate within this state—a taking of the property of each of such owners. Such a taking of property, unless it were for a public purpose, accompanied by "just compensation as determined by a jury" (article 6, § 13, Const.), could find no support in law. Lone Tree Ditch Co. v. Cyclone Ditch Co., 26 S. D. 307, 128 N. W. 596; United States v. Welch, 217 U. S. 333, 30 Sup. Ct. 527, 54 L. Ed. 787, 28 L. R. A. (N. S.) 385, 19 Ann. Cas. 680; 9 R. C. L. 736. Therefore, inasmuch as we must presume that our Legislature intended to enact a valid law when it enacted section 22, supra, and inasmuch as the wording of said section 22 permits thereof, we should and do hold that by section 22 the then existing law was in no manner changed, and that such section applies to such water only as could be drained prior to its enactment. The courts of Illinois, Iowa, and Nebraska, in which states statutes similar to our section 22, supra, were enacted prior to the enactment of such section by our Legislature, have held such statutes to be but statutory declarations of the prior common laws of such states. Lambert v. Alcorn, supra; Dorr v. Simmerson, 127 Iowa, 551, 103 N. W. 806; Aldritt v. Fleischauer, 74 Neb. 66, 103 N. W. 1084, 70 L. R. A. 301.

Courts are quite generally agreed that the waters that can be drained from the dominant estate over the servient estate are waters that can be drained from the one estate to the other in accordance with "the general course of natural drainage" for the basin where such waters are found; therefore they have refused the right of an upper landowner to drain a pond or marsh by carrying waters therefrom into some water course other than one which nature had provided for the drainage of such pond or marsh. Anderson v. Henderson, 124 Ill. 164, 16 N. E. 232;

Dayton v. Drainage Com'rs, 128 Ill. 271, 21 N. E. 198; Kaufman v. Lenker, 164 Iowa, 689, 146 N. W. 823; Galbreath v. Hopkins, 159 Cal. 297, 113 Pac. 174. Courts have also refused the right of an upper landowner to cut through the rim of a basin and thus carry water therefrom to a drainage channel where there was no natural outlet from such basin to such channel. Boll v. Ostroot, 25 S. D. 513, 127 N. W. 577; Davis v. Fry, 14 Okl. 340, 78 Pac. 180, 69 L. R. A. 460, 2 Ann. Cas. 193. The court held to the contrary in Aldritt v. Fleischauer, supra, but such holding is entirely consistent with the " common enemy" rule adopted by that court. But the mere fact that water might be drained from an upper estate in accordance with "the general course of natural drainage" is not the sole test to be applied; we apprehend that no one would contend that permanent bodies of water could be drained simply because they were so situated that they might be drained out in accordance with "the general course of natural drainage"; there must therefore be something else besides the possibility of draining waters in accordance with "the general course of natural drainage" upon which to base a claim of easement.

[6] Let us then consider what is the common law of this state in relation to the drainage of agricultural lands. It is well settled that the common law of a state may differ from that of other states or may even vary from time to time in order to meet the peculiar, and perchance varying, conditions and circumstances of the state. 5 R. C. L. 811. The rights acquired and the burdens undertaken by those who settle upon or purchase lands in a particular locality are such rights and burdens as are consonant with the just rights and burdens of those people who may become possessed of other lands in the same locality. These rights and burdens must, from the very nature of things, depend upon the purposes for which nature has apparently fitted and intended such lands. Nothing is better settled than that the law of easements is founded upon nature's laws and nature's works. We must therefore ask what rights and burdens, consonant with good neighborliness and with the reasonable furtherance of husbandry, should be held to attach to our agricultural lands? Certainly every person who acquires land normally fitted for cultivation should have the right to render them permanently fitted therefor

if he can do so without injustice to another; therefore one who acquires lands, over which a water course passes through which upper lands normally dry can be drained in accordance with "the general course of natural drainage," should be held to have acquired same knowing that good neighborliness and the common welfare required him to permit of the drainage of such upper lands through such water course conditioned only that such drainage be accomplished without unreasonable injury to his land.

[7] Appellant asked the trial court to find that the waters in the basin on his land were "surface waters." This finding was refused. Such refusal was error. That these waters were "surface waters" as they flowed into this basin no one would dispute and we hold with the decision in Brandenberg v. Zeigler, 62 S. C. 18, 39 S. E. 790, 55 L. R. A. 414, 89 Am. St. Rep. 887, that such water did not lose their character as surface waters simply because they remained ponded in a basin for a time until they disappeared through evaporation or percolation, leaving the bottom of the basin dry. Surface waters are surface waters and permanent waters are permanent waters, whether situate in a state recognizing the right of drainage to be an easement or in one treating surface waters as a "common enemy," and we would call particular attention to the holdings of the Minnesota court as to what bodies of waters are and what are not surface waters. Gilfillan v. Schmidt, 64 Minn. 29, 66 N. W. 126, 31 L. R. A. 547, 58 Am. St. Rep. 515; Krupke v. Stockard, 103 Minn. 349, 115 N. W. 175. That normally the drainage into this basin was so limited as to soon disappear and leave the soil suited for cultivation is undisputed. The normal, and not the abnormal, conditions must determine the rights and burdens attaching to lands. Whether waters are of a nature to be treated as "surface waters" for the purposes of drainage must, in each case, be a question of fact to be determined from the evidence. If the courts in the cases of Fenton and Thompson R. Co. v. Adams, 221 Ill. 201, 77 N. E. 531, 112 Am. St. Rep. 171, Noyes v. Casselman, 29 Wash. 635, 70 Pac. 61, 92 Am. St. Rep. 937, and Butler v. Peck, 16 Ohio St. 335, 88 Am. Dec. 452, had based their decisions upon the propositions above announced, there would not have been the apparent conflict in such decisions. These decisions were all rendered by courts recognizing the law of easements as

controlling rights of drainage, and in each case, like the one before us, the owner of the dominant estate was seeking to artificially drain from a basin along the line of a natural water course all of the water in such basin, while nature had cut a ditch through the rim of the basin through which only a part of such waters might have been discharged. In the Adams case the court sustained the easement, citing in support of such holdings decisions which only went to the extent of holding that one might artificially hasten the flow of such waters as would, by nature, have passed down the water course. All of the waters sought to be drained were "surface waters," the artificial drainage was along a natural water course, and such drainage did not unreasonably injure the servient estate. In the Casselman case it does not appear that the lands sought to be drained were normally fit for agriculture, or that there would not be unreasonable injury to the servient estate. In the Peck case it affirmatively appears that the lands of the basin were unfitted for agriculture. Of the case of Hopkins v. Taylor, 128 Minn. 511, 151 N. W. 194, we need only say that it was decided by a court that recognizes the "common enemy" doctrine.

[8-13] But even though the waters of the basin in question are surface waters and there is a legal burden upon respondents' lands to receive such waters through the natural water course crossing such lands, such burden and the accompanying easement is one that is reasonable, or, as above noted, one consonant with good neighborliness. Under the claim of an easement appellant could not rightfully turn upon the servient estates large volumes of water, out of all proportion to the capacity of the water course, and thus cause serious damage to respondents. It may be that, upon the first opening of the ditch in question, the waters were permitted to flow down the water course in an unwarranted volume; but, be that as it may, it is immaterial for the purposes of this action in which an injunction against the future use of such ditch, rather than damages for past misuse thereof, is sought. Even though appellant had no right to discharge across the lands of respondents waters accumulated upon his land, owing to the amount thereof, or even though such waters had not been "surface waters" and appellant had no easement authorizing him to so discharge any part thereof, it does not necessarily follow that

respondents would be entitled to injunctional relief after such accumulation had disappeared. The situation is not that presented in Boll v. Ostroot, supra, where action was brought before the artificial drainage was completed. It might well happen that one might have a right to restrain another from emptying onto his land through an artificial ditch waters stored in a reservoir, and yet have no equitable ground for an injunction requiring the closing of the ditch after such waters were so discharged. Alsager v. Peteron, 31 S. D. 452, 141 N. W. 391, Ann. Cas. 1915D, 1251; Joyce on Injunctions, § 41. The lower landowner cannot sit back like the "dog in the manger" and say to his neighbor: You had no easement under which you had a right to discharge waters from your lands across mine, and I will therefore not permit of such discharge even though it will result in no material damage to me or even though, at a trifling expense or with very little labor, I can pass such water across my lands without injury to such lands. Thus in every case where injunctional relief is sought there may arise questions in no manner pertaining to a right of easement. As to such questions each case must stand or fall on the facts peculiar thereto. Comparative benefits can properly be considered in determining whether one claiming an injury is entitled to equitable relief. McGregory v. Silver King Mining Co., 14 Utah, 47, 45 Pac. 1091, 60 Am. St. Rep. 883; Farnham on Water and Water Rights, 2624; Wood v. Bangs, 1 Dak. 172, 46 N. W. 586; Joyce on Injunctions, § 20. It seems to us that the evidence received was far from sufficient to support a finding that it was through the opening of the ditch in question that respondents' lands were damaged to the extent found by the trial court or even to any extent. If the evidence showed that the rain and snowfall, during the years when it is claimed that respondents' lands have been rendered unfit for tillage, had been normal, and that the only water coming onto the lands alleged to be damaged was that coming from this 100-acre tract, the situation would be quite different. But the testimony of respondents and their witnesses clearly shows that, after this 100-acre basin was emptied of its waters in the spring of 1909, respondents suffered little, if any, damage until the year 1913. The evidence on the part of respondents, as well as that on the part of appellant, was to the effect that, during the two or three years preceding and up to

the time of the trial herein, there had been an unusual amount of rainfall in that section of the country. It appeared that, during these wet seasons, there were other lands in that neighborhood that had been too wet to cultivate. One witness, a tenant on lands between those of respondents and appellant, but adjoining appellant, testified to diverting the waters as they came across his lands. He diverted them from their natural course into a straight line by the simple expedient of plowing a dead furrow, in which furrow the water thereafter ran. From about 1894 to 1909, appellant drained the waters from his 100-acre tract by means of tiling laid along the course of his present ditch. It appears that he drained it just as thoroughly as he now does through such ditch, and yet there is no evidence that, during this long period, respondents suffered any damage from such drainage. It would therefore seem to be established beyond all question that it is the abnormal rainfall that is causing the damage suffered by respondents. By the evidence submitted respondents have not shown, and the burden so to do was on them, that as much of their lands would not have been rendered unfit for cultivation through the flowage of surface waters upon them from those parts of this watershed other than that part draining into this 100-acre tract, together with the natural overflow from such 100-acre tract. Another thing must be borne in mind: While respondents had a right to cultivate their lands, if in so doing they plowed up this natural water course and through cultivation put it into a condition that would interfere with the free flowage of the surface waters that in accordance with nature flowed down such course, and thus caused lands in this course to become too wet for tillage, they cannot complain of these extra waters coming from the 100-acre tract, unless they can satisfy the court that, through the addition of such waters, their damage has been materially increased. The testimony given falls far short of supplying this proof.

[14] To summarize: We hold the rule to be that the owner of dominant agricultural lands, situate and lying in the upper portion of a natural drainage water course or water basin has, in the course of and for the purposes of better husbandry, a legal easement right, by means of artificial drains or ditches constructed wholly upon his own land, to accelerate and hasten the flow of

waters that are surface waters under the rule herein laid down, and to cast the same into and upon a servient estate lying lower down in the same natural drainage water course, at that point where nature, by means of ravines or depressions, has indicated that such surface waters should find a natural outlet; provided, however, that such surface waters should not be collected or permitted to collect, and then be cast upon the servient estate in unusual or unnatural quantities; and, provided, also, that the surface waters of one natural watershed or basin may not, by means of the cutting or removal of natural barriers, be cast into or upon lower lands lying in another and different natural drainage course or basin.

The judgment and order appealed from are reversed.