Ordell A. WINTERTON and Madeline Winterton, Plaintiffs and Appellees,

v.

Stanley K. ELVERSON, Defendant and Appellant.

No. 15048.

Supreme Court of South Dakota.

Argued March 18, 1986.

Decided June 4, 1986.

Lawrence L. Piersol, Davenport, Evans, Hurwitz & Smith, Sioux Falls, for plaintiffs and appellees; Rick W. Orr, Souix Falls, on brief.

Timothy J. Nimick, Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellant; J.B. Lammers, Lammers, Lammers, Kleibacker & Casey, Madison, on brief.

SABERS, Justice.

This is an appeal from the trial court's award of damages, injunction, and prejudgment interest for the discharge of water from defendant's drainage tile upon plaintiff's agricultural land. We affirm in part, reverse in part and remand.

### Statement of Facts

Appellees Ordell A. and Madeline Winterton (Winterton), have lived on and farmed the Southwest Quarter of Section 25, Logan Township, Minnehaha County, South Dakota, since 1951. Appellant Stanley K. Elverson (Elverson), is an adjacent landowner whose agricultural property is located to the northeast of the Winterton's land. A county road separates the property of the parties. Elverson's land is dominant, or higher than the Winterton's property.

Prior to 1975, Elverson's land would naturally drain surface water into a natural waterway onto Winterton's land after a heavy rain or during the spring runoff. This drainage occurred sporadically and never prevented Winterton from farming his land. Additionally, the rate of flow of the water kept it moving across Winterton's property so that it would not accumulate or stand for more than a short period of time. Thereafter, it would evaporate or be absorbed into the soil.

In the fall of 1975, Elverson installed a tile drainage system upon his property to enhance its productivity and to reduce erosion. The system drained only surface water and discharged it into the natural drainage waterway. Elverson asserts that the volume of surface water drained was not increased by the installation of the system. However, the tile drainage system caused a continuous and even flow of surface water to drain at a much slower rate onto Winterton's land. The water stayed on his land rather than flowing over or through it. As a result, Winterton claims that approximately three to four acres of his land remain wet and untillable throughout most of the year, that seven additional acres suffered reduced productivity, and that he has difficulty controlling weeds on the portion of his land directly affected by the tile.

The trial court found that Elverson increased the natural burden to the servient land by changing the manner of the natural drainage to Winterton's detriment and awarded damages for lost productivity with prejudgment interest, and prohibited Elverson from maintaining and using the drainage system.

### Claims of the Parties

On appeal, Elverson argues that the trial court misapplied the law to the facts; that

the evidence was insufficient to support the damage award; and that injunctive relief and prejudgment interest were improperly granted.

## Issue

The key issue is:

WHETHER A DOMINANT LAND-OWNER IS LIABLE IN DAMAGES TO A SERVIENT LANDOWNER FOR DIS-CHARGING SURFACE WATERS INTO A NATURAL WATERCOURSE ALL ON HIS OWN LAND, WHERE THE VOLUME REMAINS THE SAME, AND ONLY THE MANNER OF FLOW IS CHANGED FROM OCCASIONAL AND FORCEFUL TO REGULATED AND CONTINUOUS.

SDCL 46A–10A–70, (formerly SDCL 46A–10–31), codifies the civil law rule and states, among other things, that owners of land may drain the land in the general course of natural drainage through the construction of open or covered drains which discharge the water into any natural watercourse, and if such drainage is wholly upon an owner's land, he is not liable in damages to any person.

The civil law rule recognizes that lower agricultural property is burdened with an easement under which the dominant, or upper property owner may discharge surface water over the servient estate through natural watercourses. *Thompson v. Andrews*, 39 S.D. 477, 485, 165 N.W. 9, 12 (1917); *Johnson v. Metropolitan Life Ins. Co.*, 71 S.D. 155, 157–158, 22 N.W.2d 737, 739 (1946); *Gross v. Conn. Mut. Life Ins. Co.*, 361 N.W.2d 259, 266 (S.D.1985). However, the principles set forth in *Thompson* and its progeny qualify the civil law rule inasmuch as it is impermissible for a dominant landowner to collect surface waters, and then cast them upon the servient estate in "unusual or unnatural quantities." *Thompson*, 39 S.D. at 492, 165 N.W. at 14; *Johnson*, 71 S.D. at 158; 22 N.W.2d at 739; *Gross*, 361 N.W.2d at 267. Moreover, the civil law rule is conditioned upon the fact that the drainage must be accomplished without unreasonable injury to the servient

estate. *Thompson*, 39 S.D. 489, 165 N.W. at 13. Thus, the upper owner may not transfer the burdens imposed by nature on his land to that of the lower owner. *LaFleur v. Kolda*, 71 S.D. 162, 167, 22 N.W.2d 741, 744 (1946).

In *Feistner v. Swenson*, 368 N.W.2d 621 (S.D.1985), we wrote that drainage rights of a dominant landowner must be exercised reasonably even though the surface water is discharged into a natural watercourse. *Id.* at 623. We further stated that, "... surface water cannot be gathered together and cast in a body on the property of the lower owner ... so as to affect that neighbor's land in some other way than the way in which it has been affected." *Id.* (quoting from *Gross, supra.*)

With these principles in mind, we turn to appellant's arguments. Elverson emphasizes that the surface waters from his land drained into a natural waterway in accordance with SDCL 46A–10–31, (now SDCL 46A–10A–70), and that the total flow of surface water drained was not increased by the installation of the tile system.

However, prior to installation of the tiling system, Winterton was not prevented from farming all of his land despite the sporadic draining from Elverson's property. The evidence indicates that the surface waters previously flowed over Winterton's property and were absorbed into the soil within two or three days.

After the installation of the drainage system, the record shows that the continuous and slower flow of surface waters caused approximately four acres of Winterton's land to remain wet for most of the year and rendered it untillable. Moreover, the system caused an additional seven acres to suffer reduced productivity and promoted a weed problem on Winterton's land. Therefore, even if Elverson's tiling system did not increase the total volume of surface waters drained, the evidence supports the conclusion that Elverson is draining surface waters and casting them upon Winterton's property in "unnatural or unusual quantities."

In *LaFleur, supra,* we held that a dominant property owner could not drain a landlocked basin onto the servient property even though the drains followed and emptied into a natural waterway. *Id.* 71 S.D. at 167, 22 N.W.2d at 744. The *LaFleur* opinion quoted extensively from *Thompson v. Andrews, supra,* as follows:

> [E]very person who acquires lands normally fitted for cultivation should have the right to render them permanently fitted therefor if he can do so without injustice to another; therefore one who acquired lands, over which a watercourse passes through ... [should] permit ... drainage of such upper lands through such watercourse conditioned only that such drainage be accomplished without unreasonable injury to his land.

*LaFleur,* 71 S.D. 167, 22 N.W.2d at 743. In this case, we note that the "reasonableness" of Elverson's conduct relative to the injury to Winterton's property was a question of fact for the trial court's determination. *See: Feistner,* 368 N.W.2d at 624.

The scope of this court's review is limited to the question of whether the trial court's findings were "clearly erroneous." Thus, we do not look to substitute our judgment for that of the trial court, but rather to determine whether, after reviewing all of the evidence, the appellate court is left with a definite and firm conviction that a mistake has been committed. *Gross,* 361 N.W.2d at 266.

The trial court found that Elverson had increased the natural burden to Winterton's land by changing the manner of the natural drainage. What used to be an occasional, but forceful discharge of surface waters is now a regulated, but continuous flow. Furthermore, the surface waters that used to flow through Winterton's property, or accumulate for short periods of time and then evaporate, no longer do so.

In *Johnson, supra,* we held that even in the reasonable use of his land, an upper landowner is not allowed to artificially collect surface waters and discharge them all at one time to the detriment of the lower landowner. *Id.* 71 S.D. at 158, 22 N.W.2d at 739. This is true even though no more water is collected than would have naturally flowed upon the property in a diffused condition. The trial court found this reasoning applicable and stated "that those purchasing or acquiring land should expect and be required to accept it subject to burdens of natural drainage, but at the same time, the upper landowner should not be able to increase the natural burden of the lower estate."

In holding that Elverson had increased the natural burden to Winterton's detriment, the trial court specifically found that as a result of the installation of the tile, water does not flow *over* the real property of the Winterton's, but rather sits *on* their real property, and saturates it so that the land in question cannot be farmed. (emphasis added.) In *Gross, supra,* we stated that:

> In upholding the civil law rule in *Johnson v. Metropolitan Life Ins. Co.,* this Court took special note of the language in *Thompson v. Andrews,* indicating that the rule allows discharge of surface waters "over" and not "on" the land of another. (citations omitted.)

*Id.* 361 N.W.2d at 266. Therefore, a dominant landowner may only cast surface water "over" and not "on" the servient estate. *See also: Feistner,* 368 N.W.2d at 623. In the instant case, there is ample evidence to support the trial court's conclusion that due to the continuous but slower rate of discharge, the surface waters now remain on Winterton's land. In light of the record, the trial court's application of the law to the findings of fact was sound and not erroneous.

### Damages

The measure of damages for destruction of a crop is the value at the time and place of destruction. This may be established by showing the probable yield had there been no injury and the market value thereof, and subtracting therefrom the necessary cost of tilling, harvesting,

and marketing. *Bruha v. Bochek,* 76 S.D. 131, 74 N.W.2d 313 (1955).

In Finding of Fact No. X,[1] the trial court determined that there was a loss of crop production on three acres of farmland for the years 1977 through 1982.

The trial court also found that Winterton suffered additional crop damage and weed problems on the other seven acres, but awarded no money damages because of the difficulty in ascertaining them.

Elverson argues that the trial court went on to "apparently" award damages based on "ten" acres rather than "three" acres. The trial court awarded damages for losses of alfalfa, corn and soybeans, as follows:

| 1977 | $1,677.00 for loss of alfalfa |
|------|-------------------------------|
| 1978 | 1,677.00 for loss of alfalfa |
| 1979 | 1,677.00 for loss of alfalfa |
| 1980 | 1,564.50 for loss of corn |
| 1982 | 1,564.50 for loss of corn |
| 1981 | 1,580.50 for loss of soybeans |
| TOTAL | $9,740.50 |

For the years 1977, 1978, and 1979 Winterton claimed a loss for alfalfa growing on the three acres in question. For each year, the court awarded $1,677.00 in damages for the loss of three acres of crop, or a total damage for the three years of $5,031.00. However, Winterton testified that his average yield per acre was 7 tons, and that the price was $40.00 a ton. Obviously, this amounts to $280.00 an acre times three acres or $840.00 per year. The total loss for three years would equal $2,520.00, not $5,031.00.

Similarly, for each of the years 1980 and 1982, the court awarded $1,564.50, for loss of corn on three acres for a total of $3,129.00. Winterton testified that his fields averaged 90 bushels an acre and that he felt that $2.80 was a fair price for the crop for each of the years in question. The actual loss per acre at $2.80 per bushel at 90 bushels per acre is $252.00, or $756.00 per year loss. The total loss for two years would be $1,512.00, not $3,129.00.

In 1981, soybeans were planted and Winterton testified to a loss of 35 bushels per acre at an average price of $7.04 per bushel. This would be a loss of $246.40 per acre, or $739.20 for the three acres instead of $1,580.50 as found by the trial court.

Winterton cannot claim a better version of the facts than he testifies to himself. *Miller v. Stevens,* 63 S.D. 10, 16, 256 N.W. 152, 155 (1934). This proposition also applies to testimony concerning damages. *See: Drier v. Perfection, Inc.,* 259 N.W.2d 496, 506 (S.D.1977) [Damages may not be speculative; facts must exist and be shown by evidence which affords a basis for measuring plaintiff's loss with reasonable certainty.] *Dittmer v. Nokleberg,* 219 N.W.2d 201, 208 (N.D.1974) [Computation error in assessing damages will be corrected on appeal.] Accordingly, Winterton's damages should total $4,771.20 rather than $9,740.50.

Winterton claims and the trial court found that the damage testimony "took into account" and "deducted for" "what would have been the costs of production." Neither this "claim" nor this "finding" are supported by the trial transcript. The trial court must subtract "the necessary cost of tilling, harvesting and marketing" in ac-

---

1. Finding of Fact No. X

The damages which were proven at the time of trial as having been suffered were the total loss of crop production on three acres of row crop farmland for the years 1977 through 1982. There was also a reduction in production for all of those same years on an adjoining seven acres of row crop farmland but the damages suffered over those years to those seven acres are extremely difficult to ascertain and thus no damage award is made for those seven acres even though damage was suffered to those seven acres. Likewise, the condition of the ten acres in question caused by the excessive moisture from the tile resulted in the plaintiffs being unable to properly control the weeds on these ten acres and causing additional weed problems and continuing damage to the remaining adjacent cropland owned and farmed by the plaintiffs, but it is extremely difficult to ascertain the amount of compensation which would afford adequate relief for that damage so no damages are awarded even though some damage was suffered by plaintiffs and will continue to be suffered by plaintiffs to their ten acres and their other adjoining real property as a result of the problems of weed suppression.

cordance with *Bruha, supra.* Therefore, we must reverse and remand to the trial court for further testimony, evidence and findings on this point only, all in accordance with this decision.

### Injunctive Relief

██ After balancing the equities between the parties, the trial court concluded that injunctive relief was an appropriate remedy to prevent the continued wrongful discharge of water from Elverson's drainage tile. Although injunctive relief is an available remedy for injury suffered by unlawful flooding, *Gross,* 361 N.W.2d at 264, the granting of injunctive relief rests in the discretion of the trial court. *Hofer v. Bridgewater Ind. Sch. Dist.,* 76 S.D. 483, 81 N.W.2d 300 (1957). Moreover, the right to an injunction must be established with reasonable certainty. *Id.*

In *Alsager v. Peterson,* 31 S.D. 452, 456, 141 N.W. 391, 392 (1913), we wrote:

An injunction should only be granted where, under the facts proven, it appears reasonably certain that the granting thereof will protect the party seeking it from some injury that would result in his damage.

A trial court is duty bound "to determine, not merely whether a party was entitled to an injunction at the time he instituted his action, but whether, under the facts as they appear at the time of trial, such relief should be granted." *Gross,* 361 N.W.2d at 265, quoting *Alsager,* 31 S.D. at 456, 141 N.W. at 392. Each case must stand or fall upon its own peculiar set of facts. Therefore, "[c]omparative benefits can properly be considered in determining whether one claiming an injury is entitled to equitable relief." *Thompson,* 39 S.D. at 490, 165 N.W. at 14.

Elverson concludes, without supporting evidence, that the installation of the drainage tile increased the value of his agricultural land and served to reduce erosion. By contrast, Winterton proved that the surface waters continued to drain upon his

property at the time of trial, and that approximately ten acres of his farmland had been adversely affected by the drainage system. Winterton further testified that since 1977, the continuous flow of surface waters has stopped only twice for a brief period.

Since Winterton will continue to suffer some injury to approximately ten acres of his farmland unless Elverson is prohibited from using the drainage system, money damages alone would be inadequate to compensate him. *See: Hein v. Marts,* 295 N.W.2d 167 (S.D.1980), *Anderson v. Kennedy,* 264 N.W.2d 714 (S.D.1978).

In *Gross, supra,* we quoted the following from *State v. Olsen,* 30 S.D. 57, 71, 137 N.W. 561, 561–62 (1912):

It seems to be generally held that the applicant for an injunction has the burden of showing that he would in some manner be injured or deprived of some lawful right without the aid of such injunction, and that by the granting of such injunction he would obtain the desired relief.

*Gross,* 361 N.W.2d at 265.

We are persuaded that Winterton sustained his burden of showing that unless the drainage system is enjoined, he will continue to be deprived of the reasonable use of his land for agricultural purposes. Unlike the circumstances in *Gross, supra,* where a flooding incident was a one-time occurrence for which damages proved adequate, there is every indication here, that unless abated, the surface waters will continue to cause injury and impose an unreasonable burden upon Winterton's property.

Accordingly, we determine that there was no abuse of discretion in granting the permanent injunction prohibiting Elverson from using or maintaining the tile drainage system.

### Prejudgment Interest

██ The trial court awarded Winterton prejudgment interest.[2] Elverson argues

---

**2.** Although the trial court's Finding of Fact No.    XII provided for prejudgment interest on:

that this was error under SDCL 21–1–11 and the recent holding in *Hanson v. Funk Seed Intern.*, 373 N.W.2d 30 (S.D.1985), because Winterton's exact amount of crop damages were not known, or readily ascertainable by reference to prevailing markets. *Hanson* held that an award of prejudgment interest was precluded if the damages are uncertain until determined by the trier of fact. *Id.* at 36.

In *Hanson,* the plaintiff/farmer brought a breach of warranty action against a seed corn supplier for problems associated with plaintiff's field which was planted with the supplier's seed. In denying the farmer prejudgment interest in accordance with SDCL 21–1–11, the *Hanson* court wrote:

> [Plaintiff's] lost yields were unknown and thus his damages could not become certain by the mere application of his proposed arithmetic calculation because the lost yields were to be determined by the jury. Yields, per [plaintiff's] own testimony, varied year by year. [Plaintiff] was therefore not entitled to prejudgment interest under the statute[.]

*Id.*

Even though Winterton's damages were also uncertain until determined by the trial court, it does not mean that the interest award must fail. Winterton argues that the distinguishing feature under the *Hanson* case is that it involved a breach of warranty claim which sounds in contract. Here, Winterton's suit against Elverson is in the nature of tort, e.g., trespass, nuisance or negligence.

SDCL 21–1–13 provides:

> In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.

In *Meyer v. Dixon Bros., Inc.*, 369 N.W.2d 658, 660 (S.D.1985), we recognized that SDCL 21–1–13 generally applies to tort cases and unliquidated tort claims,

whereas SDCL 21–1–11 applies to liquidated and contractual claims. To that end, we stated:

> Items which represent an actual economic or pecuniary loss resulting from the breach of any obligation not arising from contract, and in every case of oppression, fraud, or malice, which are not certain in amount or not fixed as of a certain date, but must be decided by the trier of fact, may be awarded prejudgment interest in the discretion of the jury under SDCL 21–1–13.

*Id.* at 661. Although *Meyer* was concerned with the issue of prejudgment interest relative to a personal injury action, this court went on to give specific examples of items subject to such interest under SDCL 21–1–13. Among them, is "damaged or destroyed property where the value is not readily ascertainable because of unique qualities or the absence of a common market therefor." *Id.*

In applying the *Meyer* rationale, we find that Winterton's lost crops represent an actual economic loss resulting from Elverson's wrongful discharge of surface waters onto the servient estate, which action sounds in tort. Even though Winterton's damages were not fixed as of a certain date and were decided by the trial court, we hold that prejudgment interest was properly awarded under these facts consonant with SDCL 21–1–13. Given that this action was tried to the court, we held in *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251, 259 (S.D.1976), that an award of prejudgment interest based on SDCL 21–1–13 was within the discretion of the trial court as trier of fact.

Accordingly, we find no abuse of discretion in the trial court's award of prejudgment interest.

All the Justices concur.

---

$1,677.00 from December 1, 1977, from December 1, 1978, and from December 1, 1979 for alfalfa damage; $1,564.00 from December 1, 1980 and from December 1, 1982 for corn dam-age; and $1,580.50 from December 1, 1981 for bean damage, Conclusion of Law No. X only awarded Winterton prejudgment interest from December 1, 1982.