#26669-a-LSW

**2014 S.D. 1**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DENNIS PETERSON and
DEBRA PETERSON,                                        Plaintiffs and Appellants,

v.

THOMAS M. ISSENHUTH and
ISSENHUTH & LEIBEL, LLP,                         Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GENE PAUL KEAN
Retired Judge

\* \* \* \*

RONALD A. PARSONS, JR. of
Johnson, Heidepriem & Abdallah, LLP
Sioux Falls, South Dakota

        and

BRUCE M. FORD
Watertown, South Dakota                              Attorneys for plaintiffs
                                                                       and appellants.

DENNIS C. MCFARLAND
Sioux Falls, South Dakota                              Attorney for defendants
                                                                       and appellees.

\* \* \* \*

                                                                       CONSIDERED ON BRIEFS
                                                                       ON NOVEMBER 4, 2013

                                                                       OPINION FILED **01/08/14**

#26669

WILBUR, Justice

[¶1.]        Dennis and Debra Peterson (Petersons) sued their attorney, Thomas Issenhuth and Issenhuth and Leibel, LLP (Issenhuth), for legal malpractice claiming that Issenhuth failed to properly represent Petersons' interests in a breach of contract action brought against Petersons by H&S Builders, Inc. (H&S).  The circuit court denied Petersons relief in the legal malpractice action for failing to prove proximate cause or damages.  Petersons appeal.  We affirm.

FACTS AND PROCEDURAL BACKGROUND

[¶2.]        On May 22, 1990, Petersons purchased a 22.34-acre tract of land at Johnson's Point, situated adjacent to Lake Madison.  The property contained some outbuildings.  Petersons renovated one of the outbuildings and converted it into a convenience store, bait shop, and small café.  The store was eventually known as The Point.  Petersons purchased the property with the intention of developing and selling 29 platted residential lots to individuals.

[¶3.]        Petersons sold two lots (lots 23 and 24) to H&S for $55,000 each on August 23, 2006.  Petersons hired Issenhuth to prepare a purchase agreement for the parties.  The purchase agreement bound Petersons to provide water, sewer service, and a gravel road to lots 23 and 24 before June 1, 2007.  The purchase agreement contained a mandatory arbitration provision to resolve any dispute that arose between Petersons and H&S.

[¶4.]        In late 2007, a dispute arose when H&S claimed that Petersons breached the purchase agreement by not providing water, sewer service, and graveled roads to lots 23 and 24 by the agreed date of June 1, 2007.  Following

-1-

discussions between Petersons and H&S, Petersons apparently refunded two $25,000 lot payments to H&S. One payment occurred on April 16, 2008, and the other on June 3, 2008. Petersons decided to make these payments without seeking advice of counsel. No further payments were made by Petersons. H&S sued Petersons on November 19, 2009, alleging that Petersons had breached the August 2006 purchase agreement.[1]

[¶5.]     Petersons retained Issenhuth to defend them in the lawsuit. Issenhuth prepared an answer and a counterclaim on December 18, 2009. In the counterclaim, Petersons alleged that the two $25,000 lot payments were wrongfully made due to intimidation and for the purpose of avoiding litigation. Petersons demanded the return of both payments and claimed that they had not breached the purchase agreement. Curiously, Issenhuth, who drafted the purchase agreement with the mandatory arbitration provision, did not request that the parties engage in arbitration to resolve the dispute.

[¶6.]     On June 8, 2010, H&S served Issenhuth with requests for admissions. Issenhuth did not respond to the requests nor did he inform Petersons that he had received the requests. Because of Issenhuth's failure to respond to the requests for admissions, counsel for H&S filed the summons, complaint, and admission of service on August 6, 2010. Thereafter, the requests for admissions were deemed admitted by the circuit court. H&S then filed a motion for summary judgment, accompanied by a statement of undisputed material facts and affidavits detailing

---

1.     The summons, complaint, and admission of service were not filed until August 6, 2010.

Petersons' breach of the purchase agreement. Issenhuth, who had been served with the summary judgment motion, did not file any resistance to the motion.

[¶7.]    The circuit court granted H&S's motion for summary judgment on September 28, 2010 (September 2010 judgment). Issenhuth attended the summary judgment hearing. The order for summary judgment indicated that Issenhuth filed no documents other than an unsigned set of answers. The order awarded a judgment to H&S in the amount of $104,628.82. This amount consisted of the $60,000 balance H&S paid to buy lots 23 and 24 plus prejudgment interest at the rate of ten percent. The award gave Petersons credit for the $50,000 refund payment Petersons made to H&S. The judgment required H&S to reconvey lots 23 and 24 to Petersons once the judgment was satisfied. Notice of the entry of judgment was sent to Issenhuth on September 29, 2010. Issenhuth, however, did not notify Petersons of the entry of judgment.

[¶8.]    Less than a week before the circuit court's grant of summary judgment, H&S's counsel contacted Issenhuth extending a general offer of settlement of the case. Issenhuth did not respond. On November 10, 2010, H&S's counsel wrote to Issenhuth with a specific offer to settle, yet this offer went unanswered by Issenhuth. An additional letter containing an offer to settle was sent on February 11, 2011. Again, there was no response from Issenhuth.

[¶9.]    Petersons learned of the September 2010 judgment in early March 2011 when one of H&S's owners called Dennis Peterson and asked him "how [Petersons] were coming on deciding on the offer that [H&S] had introduced to [Petersons]." When Dennis informed the caller that he had not been apprised of any

new developments, the caller told Dennis that a judgment had been taken against Petersons several months earlier. Based on this information, Petersons attempted to contact Issenhuth. Their repeated telephone calls went unreturned. In April 2011, Petersons visited with Issenhuth and Issenhuth informed Petersons that the circuit court would not have permitted any testimony at the summary judgment hearing so it was unnecessary for the Petersons to appear at that hearing. Dennis testified that Issenhuth informed them "that the case was decided upon paperwork, not testimony."

[¶10.]     Also in April 2011, H&S's counsel called Issenhuth about a settlement and a letter from H&S's counsel followed the phone call. Issenhuth did not respond. Issenhuth never communicated the offers to settle to Petersons even though Petersons had been in communication with Issenhuth.

[¶11.]     Petersons eventually fired Issenhuth and hired a new attorney, Bruce Ford, to assist them. On June 17, 2011, Ford filed a motion to reopen the grant of summary judgment in favor of H&S. A hearing date was set for the motion, but before the hearing could occur, Petersons hired another attorney, Chris Giles, to try to settle the case with H&S. Giles contacted H&S's counsel and a settlement agreement was negotiated between the parties in late August 2011. The settlement allowed H&S to retain lots 23 and 24, conveyed lot 27 to H&S, and required Petersons to pay H&S $1,000. Ultimately, Ford abandoned his motion to set aside the summary judgment when he learned of the settlement agreement. Final satisfaction of the judgment was filed on January 26, 2012.

[¶12.]     During that same time, Petersons sold The Point and an additional lot for a total of $135,000.  At the trial, Petersons presented the testimony of local realtor, Jeff Lechner, to demonstrate their claimed damages.  Lechner assessed the value of The Point's business operation ($40,000), the land it was on ($100,000), the liquor license ($40,000), the equipment ($5,000 to $8,000), and the ongoing business ($10,000 to $15,000).

[¶13.]     On July 16, 2012, Petersons commenced this legal malpractice case against Defendants.  Issenhuth did not respond to the summons and complaint until after September 7, 2012, when Ford moved for a default judgment on the legal malpractice case.  Issenhuth eventually filed an answer to the complaint on September 26, 2012.  In its first memorandum decision, the circuit court remarked:

> The Answer did not address the merits of the Complaint.  In the Answer[,] Issenhuth complained that [the circuit court] should not have signed the Order granting Summary Judgment citing all sorts of meaningless South Dakota Code references dealing with the time the order was signed which Issenhuth claimed affected [the circuit court's] jurisdiction.  It was a mere obfuscation.  When Ford informed Issenhuth that the litigation in Civ. 10-202 [the underlying breach of the purchase agreement file] had been settled, Issenhuth indicated that he was unaware of that event.  Obviously, he had not looked at the Clerk's File Civ. 10-202.

The circuit court entered a default judgment as to liability (duty and breach) in favor of Petersons because Issenhuth failed to demonstrate that he had a meritorious defense and, without excuse, failed to timely answer the summons and complaint.

[¶14.]     Following waiver of a jury trial, the parties proceeded to a court trial on the issues of proximate cause and damages.  In examining whether Issenhuth's

negligence proximately caused any damages to Petersons, the circuit court considered whether Petersons could demonstrate that they would have prevailed at trial or arbitration on the underlying breach of contract claim, the "case within a case" standard. The circuit court determined that Petersons could not demonstrate that they would have been successful at trial or arbitration on the underlying breach of contract claim. Ultimately, the circuit court concluded that Petersons failed to prove they suffered any damages that were proximately caused by Issenhuth's negligent representation. Petersons appeal the circuit court's ruling on proximate cause and damages.

## STANDARD OF REVIEW

[¶15.]     The circuit court's findings of fact are reviewed "under the clearly erroneous standard." *Eagle Ridge Estates Homeowners Ass'n, Inc. v. Anderson*, 2013 S.D. 21, ¶ 12, 827 N.W.2d 859, 864. Conclusions of law are reviewed by this Court de novo. *Id.* ¶ 13, 827 N.W.2d at 864-65. "On review, this Court defers to the circuit court, as fact finder, to determine the credibility of witnesses and the weight to be given to their testimony." *Hubbard v. City of Pierre*, 2010 S.D. 55, ¶ 26, 784 N.W.2d 499, 511.

## DECISION

[¶16.]     Petersons contend that the circuit court's decision was based upon an incorrect interpretation of the law on proximate cause in a legal malpractice action. Petersons argue that the circuit court incorrectly found that Petersons were not entitled to any damages because Petersons did not establish that they would have prevailed against H&S at trial or arbitration of the breach of contract claim, or the

"case within a case" standard. Petersons assert that a plaintiff need not always establish proximate cause using only the "case within a case" standard.

[¶17.]    "To prevail in a legal malpractice claim, a plaintiff must prove: (1) the existence of an attorney-client relationship giving rise to a duty; (2) the attorney, either by an act or failure to act, breached that duty; (3) the attorney's breach of duty proximately caused injury to the client; and (4) the client sustained actual damage." *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 24, 652 N.W.2d 756, 767. "[P]roximate or legal cause" is defined as "a cause that produces a result in a natural and probable sequence and without which the result would not have occurred. Such cause need not be the only cause of a result. It may act in combination with other causes to produce a result." *Estate of Gaspar v. Vogt, Brown & Merry*, 2003 S.D. 126, ¶ 6, 670 N.W.2d 918, 921. *See Weiss v. Van Norman*, 1997 S.D. 40, ¶ 13, 562 N.W.2d 113, 116-17 (stating that "proximate cause" is "[a]n immediate cause and which, in natural or probable sequence, produced the injury complained of . . . . Furthermore, for proximate cause to exist, the harm suffered must be found to be a foreseeable consequence of the act complained of" (quoting *Musch v. H-D Coop., Inc.*, 487 N.W.2d 623, 624 (S.D. 1992))).

[¶18.]    Here, the circuit court held that Petersons did not establish that they would have received a more favorable result at trial or arbitration of the breach of contract claim brought against Petersons. While we have previously stated that the "case within a case" standard "is the accepted and traditional means of resolving the

issues involved in the underlying proceedings in a legal malpractice action[,]"[2] strict adherence to this traditional standard is misplaced in an attorney malpractice case involving an underlying breach of contract action. Adherence to the "case within a case" standard in this context could foreclose an aggrieved client from ever recovering against his or her attorney if the client did in fact breach the contract. The client would never be able to show success in the underlying action. Rather, for a more sensible approach to analyzing an attorney malpractice case involving an underlying breach of contract action, we look to our standard in *Staab v. Cameron*, 351 N.W.2d 463 (S.D. 1984) and *Weiss v. Van Norman*, 1997 S.D. 40, 562 N.W.2d 113, for guidance. "[A]ctions of the defendant attorney in a malpractice action [cannot] be the proximate cause of plaintiff[ ] [client's] losses under a contract [that] existed before the attorney became involved in the transaction." *Weiss*, 1997 S.D. 40, ¶ 13, 562 N.W.2d at 117 (citing *Staab*, 351 N.W.2d at 466). "This is of critical importance, since an attorney is liable in a malpractice action only for losses actually sustained as a proximate result of the conduct of the attorney." *Id.* (quoting *Staab*, 351 N.W.2d at 466). Accordingly, in this attorney malpractice case involving an underlying breach of contract action, the more appropriate analysis is found in our precedent set forth in *Staab* and *Weiss*: Whether Issenhuth's conduct proximately caused actual injury, loss, or damage to Petersons. The circuit court's reliance on the "case with in a case" standard in this case was misplaced.

[¶19.]     Even so, the circuit court correctly determined that Petersons failed to prove that they suffered any damages as a proximate result of Issenhuth's conduct.

---

2.     *Haberer v. Rice*, 511 N.W.2d 279, 285 (S.D. 1994).

"Damages are speculative, not when the amount is uncertain, but when the fact of damages is uncertain." *Bailey v. Duling*, 2013 S.D. 15, ¶ 35, 827 N.W.2d 351, 363.

[¶20.]        Initially, we note that Issenhuth can only be held liable for "losses actually sustained as a proximate result of [Issenhuth's] conduct[.]" *Staab*, 351 N.W.2d at 466.  The record demonstrates that like *Staab*, Petersons' "damage" was a direct result of Petersons' breach of the contract and actions thereafter, which occurred before Issenhuth's involvement with the underlying breach of contract case.  Indeed, Petersons did not seek the advice of Issenhuth on the breach of contract until after Petersons breached the contract and made the two $25,000 payments to H&S.

[¶21.]        The record supports the circuit court's finding that there was no evidence presented that the September 2010 judgment affected Petersons' credit rating.  As the circuit court noted, no witness from a bank testified that Petersons could not borrow money or that their credit had declined.  Based on this record, the circuit court could not evaluate the damages Petersons claimed they suffered as a result of any effect the judgment had on their credit rating.

[¶22.]        Further, there was no evidence to support Petersons' assertion that because of the September 2010 judgment, they were forced to sell The Point and additional property for substantially less value in order to "keep afloat."  The purchasing party testified that he approached Petersons first about buying The Point.  There is no evidence that the sale of The Point was forced or urgent as Petersons initially refused the offer to purchase, but later entered into negotiations

to sell it. And the purchasing party testified that he was never informed by Petersons about the September 2010 judgment.

[¶23.]       Additionally, the circuit court found Lechner's testimony concerning the value of The Point at the time of sale to be "short on paperwork, comparable sales and analysis." We agree. The record reflects that Lechner tried to use the sale of a bar in another small town as a comparison sale; however, the sale of that bar never took place. Lechner also evaluated The Point one and one-half years after the purchasing party had acquired the property and after the purchasing party had made physical alterations to the property. And, Petersons never contacted Lechner when they were negotiating with the eventual buyer of The Point to establish a market price.

[¶24.]       The record also demonstrates that the business phase of The Point was marginal. Based on his review of The Point's business tax forms, Gary Ritzman, an accountant and a witness at trial, placed a low value on the business, perhaps even a value of zero. The circuit court found Ritzman's testimony to be credible and relied upon his testimony to determine that the business was indeed marginal in value. We "defer[ ] to the circuit court, as fact finder, to determine the credibility of witnesses and the weight to be given to their testimony." *Hubbard*, 2010 S.D. 55, ¶ 26, 784 N.W.2d at 511.

[¶25.]       Lastly, as found by the circuit court, Petersons failed to show how a better settlement could have been negotiated had it not been for Issenhuth's conduct. The circuit court determined that Attorney Giles's "testimony was vague

on how a better settlement could have been brokered or on what better terms."

Based on our review of the record, we agree. Giles testified:

> **Q:** I guess I just - - is - - was the $104,000 Judgment just absolutely a hurdle at every stage of your negotiations involved with the Petersons?
>
> **A:** When I started the settlement negotiations it was somewhat - - somewhat like negotiating with a gun to your head. Because they didn't have any money to pay off the Judgment, they had the land. But they couldn't sell the land to pay off the Judgment. And so they - - they were caught in a situation of they had resources, but it was the land. And unless they could negotiate a release from H&S, they couldn't do anything with the land. And they - - they were not able to go to Mr. Wiedman, their private financer, or my understanding to any financial institution, because there was [$]104,000, plus additional interest, that was out there. So it was difficult, and I felt like we ended up having to give more than what was appropriate, but we didn't have a choice.
>
> **Q:** How would your negotiating position have changed, had these negotiations occurred before the Judgment was filed in September 2010?
>
> **A:** We would have been in a much better position, because they already paid $50,000. And it would have started along the lines of keep the two lots, and keep that cash, or something and be done. And if you back up even further, it could have even been a better position. The earlier on I felt that I would have been involved maybe a better outcome would have occurred.

Giles did not describe how the arbitration would have produced a better or more favorable result for the Petersons either on the breach of contract issue or the actual amount of an arbitration award. And while Giles testified that Petersons were in a difficult position because they lacked cash reserves to pay the September 2010 judgment, a lack of cash reserves was not caused by Issenhuth's conduct, but rather, as the circuit court found, was a product of a lack of lot sales and flat economy at the time. Therefore, it was difficult for the circuit court, and this Court,

to deduce whether the Petersons actually suffered any loss because of the settlement.

## CONCLUSION

[¶26.] Under these specific facts, the circuit court's strict application of the "case within a case" standard to evaluate proximate cause in the legal malpractice action was misplaced. However, we see no clear error in the circuit court's finding that Petersons failed to prove damages sustained as a proximate result of Issenhuth's conduct. Accordingly, we affirm.

[¶27.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and SEVERSON, Justices, concur.