#26920-a-LSW

**2014 S.D. 69**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

SHERRI STRONG,                                  Plaintiff and Appellee,

    v.

ATLAS HYDRAULICS, INC.
and CHAD HASERT,                        Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SUSAN M. SABERS
Judge

* * * *

JEFFREY R. BECK of
Beck Law, Prof., LLC
Sioux Falls, South Dakota                    Attorneys for plaintiff
and appellee.


DANIEL B. SHUCK
Sioux City, Iowa                            Attorney for defendants
and appellants.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 25, 2014

OPINION FILED **10/01/14**

#26920

WILBUR, Justice

[¶1.]        In this intermediate appeal, we review the circuit court's order granting a preliminary and a permanent injunction prohibiting and permanently enjoining a business from allowing surface water to uncontrollably discharge from its property onto a landowner's property in a manner that threatens the property and residential structure.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

[¶2.]        Sherri Strong owns a single-family residence located on Lewis Drive in Brandon, South Dakota.  Strong built the house in 1990.  Atlas Hydraulics, Inc. (Atlas)[1] owns and operates a manufacturing plant located on Sioux Boulevard in Brandon.  The Sioux Boulevard location has been Atlas's primary location for operations since 1986, though testimony at trial indicated that Atlas had recently constructed a facility at a new location on Redwood Boulevard in Brandon and moved its primary operations there.  Atlas uses the Sioux Boulevard location for storage, and at the time of the court trial for injunctive relief, the location was listed for sale.  Chad Hasert is the general manager and authorized representative of Atlas.  The west boundary of Strong's property abuts the land on Sioux Boulevard owned by Atlas.  Specifically, Atlas's 467-foot east boundary shares 74 feet with Strong while most of Atlas's remaining east frontage abuts five other single-family residential lots.

---

1.        Atlas was previously known as Pace Manufacturing (Pace).  In approximately 2008, Starcan acquired Pace and changed its name to Atlas Hydraulics, Inc.

-1-

[¶3.]     In 1998, Atlas constructed an addition to its plant on the east side of its existing building, which abutted the residential development, including Strong's west property boundary. Strong alleged that after the completion of the plant addition, she began having water problems at her house. Strong testified that she experiences six to twelve flooding events annually that cause water to flow into her garage and into her basement through the windows. In addition, she testified that in order to reduce the amount of water flowing into her basement through the windows, Strong opens the rear and overhead doors to her garage to let the water flow through the garage. Due to the water damage to her residence, Strong replaced appliances and had the new appliances placed on blocks to keep water off of the bottom of those appliances.

[¶4.]     The amount of water flowing onto Strong's property is more directly proportional to the speed at which the precipitation falls and the speed at which snowmelt occurs, than to the overall amount of precipitation received. The circuit court found that evidence presented at the injunction court trial showed that nearly all of the water from Atlas's property, caused by either rainfall or snowmelt, flowed onto Strong's property during each event.

[¶5.]     In 2008, Strong, along with other property owners abutting the Atlas property, contacted Atlas concerning the water discharge.[2] Atlas met with property owners, including Strong, and representatives from the City of Brandon, and

---

2.    The circuit court found, "Although other property owners also initiated contact with [Atlas], [Strong] is, was, and remains the property owner to bear the brunt of the water discharge from the [Atlas] property and appears to be the only property owner to have commenced litigation on this issue."

-2-

assured them that Atlas would assist in remedying the water issue and that Atlas wanted to be a "good neighbor." Atlas also met with representatives from the City. The representatives from the City gave Atlas a two-week timeline in which to find a remedy for the water problem. Atlas did not take any effective action in 2008 or early 2009 to stop the flow of water.

[¶6.]	In 2009, the city engineer conducted a survey of the Atlas property and the surrounding, affected neighbors' properties to provide alternatives to Atlas to remedy the water drainage problem. The city engineer presented two alternatives to Atlas. Both alternatives suggested the use of curbs and a berm to direct the water flow and a detention pond for water collection. The city engineer, in an October 2009 letter, requested that Atlas provide a "final design for the improvements that has been prepared by a registered professional engineer." The letter directed Atlas to provide the City with a final design proposed by Atlas's own engineer to solve the water drainage issue.

[¶7.]	After being directed to do so by the City, Atlas did not hire or consult with an engineer. Additionally, Hasert disagreed with the remedies proposed by the city engineer and did not follow through with the recommendations made by the city engineer. As of the date of the trial, Atlas had not rectified the underlying water drainage issue and water continued to flow from the Atlas property onto Strong's property.

[¶8.]	On August 6, 2012, Strong sued Atlas for nuisance, negligence, and negligence per se and demanded a jury trial. Strong also filed a motion for preliminary and permanent injunctions. On October 11, 2013, Strong gave notice to

Atlas of a hearing for the preliminary and permanent injunctions to Atlas. A court trial was held on November 26, 2013. Following trial, the circuit court gave an oral ruling granting both the preliminary and permanent injunctions. The injunctions prohibited Atlas from allowing surface water to uncontrollably discharge onto Strong's property in a manner that would threaten Strong's property and residential structure. The circuit court entered findings of fact, conclusions of law, and an order to this effect on December 19, 2013.

[¶9.]     On February 12, 2014, this Court entered its order granting Atlas's petition to appeal from the circuit court's intermediate order. Atlas presents five issues for our review:

> 1.     Whether the circuit court misapplied the relevant statutes and case law in granting an injunction regarding ground water nuisance.
>
> 2.     Whether the circuit court erred in relying on Strong's testimony, which was impeached by Atlas.
>
> 3.     Whether Strong's delay in seeking injunctive relief mitigates against any finding of irreparable harm.
>
> 4.     Whether there is sufficient evidence to show irreparable harm to warrant an injunction.
>
> 5.     Whether the circuit court erred in assessing the public interest.

## STANDARD OF REVIEW

[¶10.]     A circuit court's decision to grant or deny an injunction is within its sound discretion. *Halls v. White*, 2006 S.D. 47, ¶ 4, 715 N.W.2d 577, 579.

> We will not disturb a ruling on injunctive relief unless we find an abuse of discretion. An abuse of discretion can simply be an error of law or it might denote a discretion exercised to an unjustified purpose, against reason and evidence. In doing so,

> we review the [circuit] court's findings of fact under a clearly erroneous standard, but we give no deference to the [circuit] court's conclusions of law.

*Id.* (citations omitted) (internal quotation marks omitted).

## DECISION

[¶11.] Permanent injunctions are authorized by SDCL 21-8-14:

> Except where otherwise provided by this chapter, a permanent injunction may be granted to prevent the breach of an obligation existing in favor of the applicant:
>
> > (1) Where pecuniary compensation would not afford adequate relief;
> >
> > (2) Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief;
> >
> > (3) Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or
> >
> > (4) Where the obligation arises from a trust.

"Several guiding factors assist courts in deciding whether to grant or deny injunctive relief." *New Leaf, LLC v. FD Dev. of Black Hawk LLC*, 2010 S.D. 100, ¶ 15, 793 N.W.2d 32, 35. Those factors include:

> (1) Did the party to be enjoined cause the damage? (2) Would irreparable harm result without the injunction because of lack of an adequate and complete remedy at law? (3) Is the party to be enjoined acting in bad faith or is the injury-causing behavior an innocent mistake? (4) In balancing the equities, is the hardship to be suffered by the enjoined party . . . disproportionate to the . . . benefit to be gained by the injured party?

*Id.* (quoting *Knodel v. Kassel Twp.*, 1998 S.D. 73, ¶ 9, 581 N.W.2d 504, 507). Whether a preliminary injunction should be granted involves consideration of "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the

public interest." *Dacy v. Gors*, 471 N.W.2d 576, 579 (S.D. 1991) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

[¶12.] Further, "[a] suit for injunction is inherently an equitable action." *Knodel*, 1998 S.D. 73, ¶ 8, 581 N.W.2d at 507. "A party seeking equity in the court must do equity, including entering the court with clean hands." *Id.* (quoting *Talley v. Talley*, 1997 S.D. 88, ¶ 29, 566 N.W.2d 846, 852). "An essential element to equitable relief is the lack of an adequate remedy at law." *Id.* Thus, to obtain a preliminary injunction, the movant must show a likelihood of success on the merits. *Dacy*, 471 N.W.2d at 579. And to be successful in a request for a permanent injunction, the movant must demonstrate success on the merits. *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999) (citing *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 1404 n.12, 94 L. Ed. 2d 542 (1987)).

[¶13.] **1. Whether the circuit court misapplied the relevant statutes and case law in granting an injunction regarding ground water nuisance.**

[¶14.] Atlas asserts that the causes of action alleged in Strong's complaint will be appropriately addressed by a jury, and therefore, the circuit court lacked a statutory basis to issue an injunction. Specifically, Atlas asserts that the circuit court's grant of the permanent injunction was in violation of SDCL 21-8-14. Atlas argues that Strong presented evidence that pecuniary compensation would afford adequate relief under SDCL 21-8-14(1). Atlas also contends that the other three subsections contained in SDCL 21-8-14 are not applicable. Atlas further argues that the circuit court attempted to improperly transition a surface water drainage

issue into a nuisance issue. We now examine each guiding factor to determine whether the circuit court abused its discretion in granting injunctive relief.

*Damage*

[¶15.] In support of its position, Atlas presented the testimony of its expert that there was a significant amount of water drainage occurring in the direction of the Strong property prior to any development on the Atlas property. The circuit court, however, concluded that Atlas's expert's conclusions on the water drainage facts "lacked sufficient foundation to be reliable or complete" and that his testimony was of "limited usefulness to the [circuit court's] decision." *See Sauer v. Tiffany Laundry & Dry Cleaners*, 2001 S.D. 24, ¶ 14, 622 N.W.2d 741, 745 (providing that "[f]act finders are free to reasonably accept or reject all, part, or none of an expert's opinion"). Indeed, the record demonstrates that Atlas's expert's review of the historical data did not include any review of data predating Atlas's construction of the addition to its plant. The circuit court noted, and the record supports, that Atlas's expert examined the property at issue only one week before the court trial while Strong has lived on the property for more than 20 years. Atlas's expert conducted no speed or other calculations to determine the extent or effect of the water flow from Atlas's property to Strong's property. The record supports the circuit court's characterization of the expert's testimony that the construction of Atlas's addition "dramatically increased the slope of the land nearest the residential boundary line shared with [Strong]." In addition, the record demonstrates that Atlas's expert did not perform any soil testing or hydrology calculations and did not consider the lay of the land.

[¶16.]  Based on Strong's testimony, the circuit court found that the water drainage problem began *after* Atlas constructed the addition to its plant.  Strong testified that nearly all of the water draining from Atlas's property flowed onto her property.  Strong supported her testimony with record evidence, such as pictures of the water drainage issues and precipitation data.  The circuit court also found Strong to be an "extremely credible witness" and that she simply "misspoke and used the wrong date" during her deposition.[3]  "On review, this Court defers to the

---

3.  Strong testified at the court trial:

> **Q.** When approximately was that addition put on that building?
>
> **A.** I believe it was the [mid-90s].
>
> **Q.** [Mid-90s].  From the time that you moved in - - let me ask this: Have you had any issues with the plant?
>
> **A.** Well, since they added onto the building I've had a lot of flooding issues in my yard and through my garage and into my basement.
>
> **Q.** Was the flooding happening when it was the old size building?
>
> **A.** No, it did not.

On cross-examination, Atlas's counsel asked:

> **Q.** Now, when I took your deposition you told me that the first time you noticed water pooling in your backyard or in your basement was 1995; do you remember that testimony?
>
> **A.** Yes.

When questioned by her counsel, Strong testified:

> **Q.** [Strong], you answered a question [Atlas's counsel] asked you about when you said in the depo you said you first thought the water came in 1995?
>
> **A.** Yes, I was - -
>
> . . . .
>
> **Q.** Was - - did you know the exact date that they added onto the plant?

(continued . . .)

circuit court, as fact finder, to determine the credibility of witnesses and the weight to be given to their testimony." *Peterson v. Issenhuth*, 2014 S.D. 1, ¶ 15, 842 N.W.2d 351, 355 (quoting *Hubbard v. City of Pierre*, 2010 S.D. 55, ¶ 26, 784 N.W.2d 499, 511). Thus, the record supports the findings and conclusions of the circuit court that Atlas's actions caused the damage to Strong's property.

*Irreparable Harm*

[¶17.]     "Harm is . . . irreparable 'where . . . it cannot be readily, adequately, and completely compensated with money.'" *Knodel*, 1998 S.D. 73, ¶ 13, 581 N.W.2d at 509 (quoting *Maryhouse, Inc. v. Hamilton*, 473 N.W.2d 472, 475 (S.D. 1991)). We agree with the circuit court that, in this case, an award of monetary damages would not fix the underlying water drainage issue. It is important to note, however, that once the continuing problem ends, the harm to Strong could be adequately compensated with monetary damages. Without the issuance of an injunction, Strong's property will continue to suffer damage from fast rainfall or quick snowmelt, inevitably causing Strong irreparable harm into the future.

---

(. . . continued)

    **A.** I do not know that.

    **Q.** Did you qualify the first water came in 1995 answer with the fact that it wasn't until after the plant was built? After the addition came. You said I'm not sure when it was, but it was after.

    **A.** Yes, yes.

Furthermore, Strong testified that an award of money damages would not cure the problem at issue here.[4]

*Bad Faith or Innocent Mistake*

[¶18.]     The circuit court found that Atlas acted in bad faith by assuring Strong and the City that it was acting as a "good neighbor" and was pursuing a solution to the water drainage issue when the facts of the case show that Atlas was not in fact pursuing such a solution.  We agree.  Atlas had notice in 2008 of the water drainage issue.  The record demonstrates that the City provided Atlas alternatives and gave it a timeline for compliance with one of the alternatives.  However, as of the date of the court trial, Atlas had not remedied the water drainage issue. Neither of the City's alternative remedies would have interfered with Atlas's daily operations or business.  In contrast, the circuit court concluded that Strong had not acted in bad faith by actively working with Atlas and the City to find a solution to the problem.  She documented the problem and resulting harm to her property through photographs and precipitation data.

---

4.     The circuit court noted that

> During cross-examination of [Strong], [Atlas's] counsel asked [Strong] why she had not accepted a prior monetary settlement offer from [Atlas].  [Strong's] counsel did not object to the question.  [Strong] responded that money alone could not fix the problem.  The [c]ourt acknowledges that evidence of settlement offers is not admissible on the issue of liability, and did not consider the testimony for that purpose.  However, given the lack of objection, and [Atlas's] counsel's act of opening the door to that issue, the [c]ourt did consider the evidence relevant to its finding of irreparable harm.

*Balancing Hardship and Benefit*

[¶19.]     We agree with the circuit court that the balancing of the equities supports the issuance of an injunction in favor of Strong.  Without an injunction, Strong's property would continue to experience water damage.  The circuit court determined that the injunction would force Atlas to remedy the issue on its property—property over which Strong had no control.  Further, the injunction would not affect Atlas's ability to conduct its business.  *See Prairie Hills Water & Dev. Co. v. Gross*, 2002 S.D. 133, ¶ 39, 653 N.W.2d 745, 754 (acknowledging that "it is within the province of the trial court to enjoin all business activities which cause a nuisance, even where the result may be termination of the present use of the property") (emphasis omitted).  But, an injunction would favorably affect Strong's use and enjoyment of her property.

*Public Interest*

[¶20.]     In addition, the circuit court considered the public interest—a component of the preliminary injunction analysis—in analyzing whether injunctive relief should be granted.  *See Dacy*, 471 N.W.2d at 579.  The circuit court concluded that the public interest is best served when litigation has an end point, and if the requested injunction were not granted, Strong would have no relief from the water drainage problem and would be forced to bring suit every time it rains quickly or the snow melts rapidly.  "A trip to the courthouse to settle a legal dispute should be dispositive and not an annual event." *Hendrickson v. Wagners, Inc.*, 1999 S.D. 74, ¶ 24, 598 N.W.2d 507, 512.  We agree.

#26920

*Success on the Merits*

[¶21.]     Lastly, in granting injunctive relief, we agree with the circuit court that Strong demonstrated actual success on the merits. *See Bank One, Utah*, 190 F.3d at 847. The South Dakota Code defines a nuisance as follows:

> A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:
>
>> (1) Annoys, injures, or endangers the comfort, repose, health, or safety of others;
>>
>> (2) Offends decency;
>>
>> (3) Unlawfully interferes with, obstructs, or tends to obstruct, or renders dangerous for passage, any lake or navigable river, bay, stream, canal, or basin, or any public park, square, street, or highway;
>>
>> (4) In any way renders other persons insecure in life, or in the use of property.

SDCL 21-10-1. We agree with the circuit court's conclusion that sections one, two and four of SDCL 21-10-1 apply to this appeal.

[¶22.]     Additionally, "[f]or urban drainage of surface water, this Court has adopted the 'reasonable use' rule." *First Lady, LLC v. JMF Prop., LLC*, 2004 S.D. 69, ¶ 8, 681 N.W.2d 94, 98. "Under the reasonable use rule a landowner 'is legally privileged to make a reasonable use of his land, even though the flow of surface water is altered thereby and causes some harm to others.'" *Id.* (quoting *Mulder v. Tague*, 85 S.D. 544, 552, 186 N.W.2d 884, 889 (1971)). "The landowner, however, becomes liable 'when his harmful interference with the flow of surface waters is unreasonable.'" *Id.* Factors that this Court has considered in evaluating reasonableness include:

> (1) the respective uses of land and drainage water by each party;
> (2) topography;

(3) volume and direction of drainage;

(4) consequences of drainage;

(5) effects of artificial changes in drainage, such as grading, hard surfaces, and artificial drains;

(6) alternatives; and

(7) avoidance of unnecessary injury.

*Id.* ¶ 12, 681 N.W.2d at 99.

[¶23.] Atlas's use of its property was unreasonable. The record demonstrates that the construction of the addition to Atlas's manufacturing plant artificially changed the property's water drainage, topography, and elevation in such a way as to negatively and unreasonably impact Strong's property. The record reflects that there are alternatives to this current use to avoid unnecessary injury, yet Atlas had not taken any steps to remedy the water drainage issue. Instead, at the time of the court trial, Atlas had listed the property at issue for sale.[5] Strong has demonstrated actual success on the merits. The circuit court was within its discretion to grant the preliminary and permanent injunctions in this matter.

[¶24.] **2. Whether the circuit court erred in relying on Strong's testimony, which was impeached by Atlas.**

[¶25.] Atlas contends that the circuit court erred in relying on Strong's testimony at trial that she experienced water problems after Atlas added the addition to its building. Atlas asserts that it used Strong's deposition testimony that the water problems began in 1995 to impeach Strong during cross-examination

---

5. The circuit court noted: "Given the fact that the [Atlas] property which is the subject of this matter is currently listed for sale, there is a genuine concern [that Atlas] is continuing in its efforts to ignore the water drainage problem, perhaps now in an attempt to pass that problem onto the future property owner."

at trial.  Atlas argues that "[t]he reason this impeachment was necessary [was] because Defendant, [Atlas], built the addition to its plant in 1998."

[¶26.]    The circuit court found that Strong "clarified under oath that[ ] she previously misspoke during her deposition."  Additionally, the circuit court noted that Strong repeatedly testified that the water problems began only after Atlas built the addition to its building and that the record supported her testimony.  Further, the court remarked that Strong "was an extremely credible witness who has lived in her house since it was built in 1990 and documented the water problem well with pictures and other supporting documents, including precipitation reports."

[¶27.]    The circuit court had the opportunity to observe Strong and to listen to her testimony regarding when the water problems began in her home.  The court was also presented with photographs and documentary evidence supporting Strong's testimony.  Ultimately, the circuit court was persuaded by Strong's credibility as a witness and the evidence she presented in support of her testimony.  We decline to substitute our judgment for that of the circuit court.  Atlas has not shown that the circuit court erred as to this issue.

[¶28.]    **3.    Whether Strong's delay in seeking injunctive relief mitigates against any finding of irreparable harm.**

[¶29.]    Atlas asserts that Strong's 13 to 15 year delay in filing suit and the 14 month delay between filing suit and her request for a hearing on the injunctions mitigates against any finding of irreparable harm.  Atlas argues that although not dispositive, these periods of delay are relevant in showing that Strong would not suffer irreparable harm and that an injunction was not necessary.

[¶30.]    As noted above, the circuit court adequately addressed all four factors in ruling on Strong's request for injunctive relief, including the second factor— "[w]ould irreparable harm result without the injunction because of a lack of an adequate and complete remedy at law[.]" *See New Leaf, LLC*, 2010 S.D. 100, ¶ 15, 793 N.W.2d at 35. Atlas concedes that any delay is not determinative as to whether granting an injunction is appropriate. But rather, we consider whether irreparable harm would result because of a *"lack of an adequate and complete remedy at law."*[6] The circuit court found that there would be no end to the harm and that it was difficult to quantify if an injunction were not granted. The court also noted that Strong testified that monetary compensation would not solve the ongoing influx of water from entering her home. Lastly, the circuit court commented that though it would not consider settlement negotiations as to any liability, it would consider the

---

6.    In support of its argument, Atlas cites to *Crow Creek Sioux Tribal Farms, Inc. v. U.S. I.R.S.*, 684 F. Supp. 2d 1152, 1158 (D.S.D. 2010). In *Crow Creek*, the plaintiffs waited to file their motion seeking a temporary restraining order until the day before the subject land was set for sale, even though the plaintiffs had known of the planned public auction for nearly six weeks. *Id.* at 1158. The district court noted that "[a]lso relevant, *though not dispositive*, to determining whether there would be irreparable harm is a party's delay in seeking injunctive relief[.]" *Id.* (emphasis added). The court stated that "[t]he delay in filing the TRO motion may be viewed as indicating that the Plaintiffs would not suffer irreparable harm without the injunctive relief." *Id.* The district court then went on to remark that "[b]ecause the [c]ourt expects to have this case concluded within the 180-day redemption period, there is an adequate remedy available to the Plaintiffs. The harm to the Plaintiffs, thus, is not irreparable, and injunctive relief is not warranted." *Id.*

The circuit court found that Strong, unlike the plaintiffs in *Crow Creek*, did not have an adequate and complete remedy at law. And the record supports the circuit court's conclusion that Strong would suffer irreparable harm if an injunction were not granted. Therefore, the delay, while relevant, is not dispositive to our determination of whether Strong would be irreparably harmed.

fact the negotiations probably corresponded to some delays in scheduling the hearing. We agree. The circuit court did not abuse its discretion in determining that irreparable harm would result without the injunction.

[¶31.]     **4.     Whether there is sufficient evidence to show irreparable harm to warrant an injunction.**

[¶32.]     As a further extension of its argument from issues one and three, Atlas asserts that Strong has failed to put forth sufficient evidence to show irreparable harm to warrant an injunction. Atlas again points to Strong's lack of remediation efforts and her delay in seeking judicial relief as evidence of Strong's failure to show irreparable harm and bar her from receiving injunctive relief. Atlas also claims that the circuit court not only improperly granted an injunction in this case, but also rendered an opinion on the material facts, thus taking the case from the future jury. Lastly, Atlas asserts that the circuit court "will have greatly prejudiced the jury against [Atlas] by allowing the evidence regarding the injunction to be admissible" at trial.

[¶33.]     As determined in issues one and three above, the circuit court did not abuse its discretion in granting the injunction in this case. The court thoroughly examined the factors in ruling on the request for an injunction. The court heard testimony from several witnesses, weighed that testimony, and considered other evidence in its decision. In addition, any argument relating to admissibility of certain evidence at a future trial on damages does not enter into our consideration today. Therefore, the circuit court did not err in granting the injunction in this case.

[¶34.] **5.** **Whether the circuit court erred in assessing the public interest.**

[¶35.] Lastly, Atlas contends that the circuit court erred in disregarding and minimizing Atlas's public interest evidence. Atlas asserts that any remediation efforts to route water into the street would then damage property located downhill from Strong's property. Atlas argues that as a result, it would then be exposed to more potential lawsuits by other landowners.

[¶36.] The "public interest" is one factor in assessing whether injunctive relief should be granted. *See Dacy*, 471 N.W.2d at 579. The circuit court determined that the public interest would not be served if Strong were required to bring a suit every time it rains fast or every time the snow melts quickly causing water to flow from Atlas's property to Strong's property. The circuit court concluded that "[t]he public interest is best served when litigation has an end point. If the requested injunction is not granted, the problems faced by [Strong] will be never ending."

[¶37.] That is not to say, however, that the circuit court did not have the opportunity to observe and listen to the testimony of Atlas's expert, who warned of potential water issues to downhill property owners if the water were to be diverted to the street and off of Strong's property. The court ultimately found the expert's testimony to "be of limited usefulness to the [c]ourt's decision. The expert's conclusions on the facts of this case lacked sufficient foundation to be reliable or complete." Again, "[f]act finders are free to reasonably accept or reject all, part, or none of an expert's opinion." *Sauer*, 2001 S.D. 24, ¶ 14, 622 N.W.2d at 745. Accordingly, the circuit court did not err in examining the public's interest in granting injunctive relief in this case.

#26920

## CONCLUSION

[¶38.] We affirm the circuit court's grant of the preliminary and permanent injunctions.[7]

[¶39.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and SEVERSON, Justices, concur.

---

7. At the close of Strong's brief, counsel requested that this Court grant "Plaintiff/Appellee's Motion for Attorney's Fees and Costs," yet counsel did not file a motion seeking such an award of fees and costs. Because counsel did not file a motion, this request is denied.

-18-