#28761-a-JMK
**2020 S.D. 3**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JAMES CARMODY,                                    Appellant,

    v.

LAKE COUNTY BOARD OF
COMMISSIONERS,                                    Appellee,

    and

STEVEN CARMODY and
DALLAS SCHWIESOW,                                 Interested Parties.

-------------------------------------------------------------------------------------------------------------------

JAMES CARMODY,                                    Appellant,

    v.

LAKE COUNTY BOARD OF
COMMISSIONERS,                                    Appellee,

    and

EDWARD BECKER,                                    Interested Party.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DAWN M. ELSHERE
Judge

* * * *

CONSIDERED ON BRIEFS
APRIL 29, 2019
OPINION FILED **01/22/20**

MIKE C. FINK
Bridgewater, South Dakota                    Attorney for appellant.


WILLIAM C. GARRY
MELISSA R. JELEN of
Cadwell, Sanford, Deibert
    & Garry, LLP
Sioux Falls, South Dakota                    Attorneys for appellee.

#28761

KERN, Justice

[¶1.]    Steven Carmody and Edward Becker applied for permits to install drain tile on their respective properties in Lake County. James Carmody objected to both permits. The Lake County Board of Commissioners, sitting as the Lake County Drainage Board (Board), approved the permits at public hearings, and James appealed to the circuit court. The appeals were consolidated. The circuit court, following a trial, applied the abuse of discretion standard of review and affirmed the Board's approval of the drainage permits. James appeals. We affirm.

## Facts and Procedural History

[¶2.]    Lake County adopted a drainage ordinance in 2002. The ordinance requires landowners to obtain a drainage permit before installing drain tile. Applicants must "provide a detailed site plan showing the location of the proposed construction. The site plan shall include a description of the type and size of the drain, and the location of the proposed outlet." An administrative official reviews the application. Applications that are incomplete or "insufficient to make an informed decision on the application . . . shall be returned to the applicant for revision. The [a]dministrative [o]fficial may also require that the applicant provide a detailed survey prepared by a professional engineer or surveyor."

[¶3.]    The Board considers drainage permit applications at public hearings. Affected landowners within one mile of the proposed drain outlet must be notified of the hearing by certified mail. Additionally, notices of hearings on permit applications are published in a local newspaper and posted conspicuously by the

proposed project site.  The ordinance sets forth the factors the Board must consider when evaluating permit applications.

> At a minimum, the following factors shall be considered in evaluating the impact of a proposed drainage project:
> 1) Flood hazards, floodplain values;
> 2) Erosion potential;
> 3) Water quality and supply;
> 4) Agricultural production;
> 5) Environmental quality;
> 6) Aesthetics;
> 7) Fish and wildlife values; and
>> 8) Considerations of downstream landowners and the potential adverse effect thereon including consideration of the following criteria:
>>> a) Uncontrolled drainage into receiving watercourses which do not have sufficient capacity to handle the additional flow and quantity of water shall be considered to have an adverse effect.
>>> b) Whether drainage is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, or in the absence of a practical natural drain, a reasonable artificial drain system is adopted.
>>> c) The amount of water proposed to be drained.
>>> d) The design and other physical aspects of the drain.
>>> e) The impact of sustained flows.

Also, under SDCL 46A-10A-30, county boards are bound by the factors set forth in SDCL 46A-10A-20, codifying the civil law rule, when considering drainage permits in rural areas.

[¶4.]        Steven and James own adjacent farmland in Lake County.  An established watercourse flows west from Steven's property into a ditch on James's property, then begins its northerly route under a road into a ditch on Don Halverson's property, and then flows into a ditch on Vernon Olson's property.  Finally, the water empties into a wetland owned by James.  The wetland is not

#28761

currently farmed because it is under contract with the Conservation Reserve Program (CRP) until 2022. Steven applied for a drainage permit in late 2017 to install drain tile on his farmland. Steven's application included plans to install pipe on James's property as well, although Steven had not obtained permission from James to do so, nor did he present authority allowing him to come onto James's property without permission.

[¶5.] The Lake County Drainage Administrator, Mandi Anderson, produced a staff report for Steven's application. The staff evaluation section noted that Steven's property was the dominant estate, described the flow of the established watercourse, and described past maintenance of the drainage ditches. The report indicated that Steven had been denied a permit for a similar drainage project in 2013, but there was no record of the reason for the denial. The staff report recommended that Steven's permit be granted for the following reasons:

> I do believe that the land receiving the water will remain rural in character and that this new drain tile [will] not create unreasonable hardship or injury.
>
> That the land being drained is being done so in the smallest amount to increase the yield of future crops and will improve soil erosion and therefor[e] it is a reasonable request.
>
> The proposed drain tile will not alter the current water course.
>
> The proposed tile is the minimum tile plan that will make possible the reasonable use of the land.

The report also references relevant definitions from the Lake County drainage ordinance and factors to consider in evaluating permit applications. Prior to the hearing, Board members received a packet of information containing Steven's application and other pertinent information.

[¶6.]     James received notice of Steven's proposed drainage project and objected. The Board held a hearing on November 21, 2017. Steven and Dallas Schwiesow, the tile installer, appeared and spoke in favor of the application. James and Halverson appeared to present their objections. James first objected on the basis that Steven had not obtained permission to install pipe on his land. He also claimed that due to obstructions to the water flow on Olson's property, water had been backing up in the ditch on his farmland and was taking a long time to dry, making it difficult to farm. In support of his objection, he presented pictures of flooding on his property in 2014.[1] He argued that Steven's project would further increase the flow of water onto his property, and it would take even longer to dry out.

[¶7.]     Steven withdrew his plans to install pipe on James's property at the hearing, but there was no decision as to where the new outlet would be located. At the end of the hearing, the Board approved Steven's drainage permit application and adopted the findings of the staff report. The Board did not request a new application with revised plans. The Board also suggested that those affected by obstructions on Olson's property should take him to court to force him to clean out his ditch.

[¶8.]     The second permit concerns Becker's land. An established watercourse runs south off Becker's property into an existing tile line on property owned by Adam Gaspar and Angela Dornbusch. The water then empties into James's CRP

---

1.     James did testify at trial, however, that after cleaning out his drainage ditches in 2017 the water has not come up quite as high as it did in 2014, but he claims he still experiences problems with ponding on his property.

wetland, flows onto another parcel of Becker's land to the west, and continues flowing northwest. Becker had applied for a drainage permit in early 2018 to drain five acres of his land by hooking into the tile line on Gaspar and Dornbusch's property. Like the report prepared for Steven's application, Anderson's staff report described the location of Becker's proposal, the characteristics of the tile line involved, and the current watercourse. It also referenced the applicable definitions and evaluation factors from the ordinance. Anderson's report recommended approval of Becker's permit for reasons identical to those set forth in Steven's application. The Board again received a packet of information relating to the application prior to the hearing on February 6, 2018.

[¶9.] At the public hearing, James and Halverson objected to Becker's application. James gave a presentation to the Board, arguing that every new drainage project the Board approved caused hardship to his property. While the land involved in the Becker permit was currently unfarmed, James informed the Board that the amount of water in his wetland already exceeded its carrying capacity. After a motion to deny Becker's permit failed, the Board voted to approve Becker's drainage application.

[¶10.] James timely appealed both permits to the circuit court, and the cases were consolidated. James requested a de novo review of the Board's decision to issue the permits under SDCL 7-8-30. During a pretrial hearing to determine the applicable standard of review, the circuit court ruled that a decision to grant or deny a drainage permit is administrative, not quasi-judicial, and therefore, the

correct standard of review is abuse of discretion. As such, the court concluded that the burden of proof would rest on James.

[¶11.] The circuit court held an evidentiary proceeding on July 20, 2018. The court heard testimony from James, Halverson, Anderson, Schwiesow, Steven, and Becker. The court also received several exhibits into evidence, including the Lake County drainage ordinance, the permit application materials, the materials James presented to the Board, and the minutes of both hearings. Because Lake County does not record its hearings, the court admitted audio recordings James made of each hearing on his cell phone. The court also received several maps and aerial photographs for demonstrative purposes only because the Board did not consider them.

[¶12.] On August 28, 2018, the court issued a memorandum opinion, concluding that it could not "find that the Board acted unreasonably, arbitrarily or manifestly abused its discretion." Therefore, it affirmed the drainage permits. It determined that the Board had considered the relevant evidence, followed its established procedures and policies as set forth in the Lake County drainage ordinance, and properly considered the requirements of state law. In reaching this conclusion, the court relied upon the staff reports, which related that "the drainage applications would not create an unreasonable hardship, . . the land being drained was being done in the smallest amount to increase yield of future crops[] and will improve soil erosion, and that the projects would not alter the current watercourse . . . ." The court also issued findings of fact and conclusions of law on September 24, 2018.

[¶13.]    James appeals, raising two issues:

1.    Whether the circuit court applied the correct standard of review and burden of proof.

2.    Whether the circuit court erred when it affirmed the Board's decision to issue the drainage permits.

**Analysis and Decision**

1.    *Whether the circuit court applied the correct standard of review and burden of proof.*

[¶14.]    James argues the circuit court erred by applying the "abuse of discretion" standard of review. James cites SDCL 7-8-30, which provides that appeals from the decisions of boards of county commissioners are to "be heard and determined de novo . . . ." He further argues that the Board's actions were quasi-judicial because the Board was required to weigh James's interests against Steven's and Becker's based upon factors set forth by the ordinance and state law.

[¶15.]    In *State of South Dakota, Department of Game, Fish and Parks v. Troy Township*, we reconciled contradictions in our precedent regarding the appropriate standard of review for administrative actions. 2017 S.D. 50, 900 N.W.2d 840. We concluded that the de novo standard of review does not apply, regardless of whether de novo review is prescribed by statute, unless the administrative action is quasi-judicial. *Id.* ¶ 13, 900 N.W.2d at 846. This is because under the separation of powers doctrine, courts "may not exercise or participate in the exercise of functions which are essentially legislative or administrative." *Id.* ¶ 14, 900 N.W.2d at 846 . Indeed, "the judicial branch may not wield legislative or executive power . . . . Therefore, . . . a court may not substitute its judgment for that of an

administrative board on issues that are not quasi-judicial." *Id.* ¶ 20, 900 N.W.2d at 849.

[¶16.]     In *Troy Township*, we identified certain relevant considerations to determine whether an administrative action is quasi-judicial in nature, rendering it subject to de novo review, or not quasi-judicial, subjecting it to review only for an abuse of discretion. For example, we observed that an "[a]dministrative action is quasi-judicial if it investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist[.]" *Id.* ¶ 21, 900 N.W.2d at 849. Similarly, quasi-judicial acts are akin to "the ordinary business of courts" or are actions that "could have been determined as an original action in circuit court." *Id.* In contrast, non-quasi-judicial administrative acts are of the type that are prospective. Those actions look to the future and change "existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." *Id.* Further, non-quasi-judicial acts include those done in the public interest without "adjudicat[ing] existing rights of specific individuals." *Id.* ¶ 22, 900 N.W.2d at 849–50.

[¶17.]     *Troy Township* serves broadly as a guidepost informing circuit courts that de novo review does not apply unless the administrative actions "require the exercise of purely judicial power[.]" *Id.* ¶ 15, 900 N.W.2d at 847. This is because "the great powers of the government—the legislative, executive, and judicial—[must] be separately exercised by the departments in which such power is expressly lodged[.]" *Id.* ¶ 15, 900 N.W.2d at 846. Indeed, boards of county commissions have the authority to make decisions of an "administrative character" and "those of a

legislative and *quasi*-judicial character as well." *Id.* ¶ 15, 900 N.W.2d at 846–47. Whether an action is quasi-judicial is a fact-based inquiry undertaken on a case-by-case basis.

[¶18.]     Here, Steven and Becker applied for drainage permits with the Lake County Drainage Board. The Board held separate hearings on each permit. It considered a staff report related to both permit requests, statements and exhibits from the applicants, and citizen objections. In addition to this information, the minutes from the hearing on Steven's permit reflect a discussion regarding the need for landowners along the waterway to work together, the benefits of tiling, and the necessity of taking one of the adjacent landowners, Vernon Olson, to court to require him to clean out his ditch. Ultimately, the Board granted the permit and adopted "the facts and findings in the staff report."

[¶19.]     At the hearing on the Becker permit, in addition to the information in support of the petition, the minutes reflect a discussion regarding adoption of the drainage ordinance in 2005, maintenance done, and the availability of a termination map. Like Steven's, the minutes from Becker's hearing reflect that the "Olson property [was] not clean." The Board also approved Becker's application. James, as a person aggrieved, exercised his right to appeal the Board's decisions issuing drainage permits to Steven and Becker to circuit court. *See* SDCL 7-8-27.

[¶20.]     Although SDCL 7-8-30 prescribes de novo review, the separation of powers doctrine requires us to determine whether the Board's decision to grant the permit applications was an exercise of its administrative power or its quasi-judicial power. Distinguishing between the related, but divergent roles the Board exercises

in governing the regulation of drainage within its county is critical to answering this inquiry. In one instance, the Board may act as an administrative body authorized to review applications and issue drainage permits. *See Troy Twp.*, 2017 S.D. 50, ¶ 15, 900 N.W.2d at 846–47. In another, the Board may convene as an adjudicative body and resolve a drainage complaint. *See id.* Similarities exist between these two roles because both involve a decision that could potentially impact the water interests of landowners. These similarities, however, do not mean this Court should ignore the separation of powers doctrine so as to encroach upon the Board's administrative power to issue drainage permits.[2]

[¶21.]       The Legislature vested administrative authority over drainage in boards of county commissions. SDCL 46A-10A-2. In this regard, SDCL chapter 46A-10A empowers the county to create a drainage plan to "enhance[e] and promot[e] [the] physical, economic, and environmental management of the county" and regulate the county's drainage system. SDCL 46A-10A-17. Further, as part of this plan, "[a]ny board or commission may adopt drainage ordinances . . . to control individual drainage construction or rehabilitation[,]" or to adopt other "drainage methods by groups of landowners within the county." SDCL 46A-10A-46. Finally, SDCL 46A-10A-30 empowers the Board to create a permit system for drainage.

_____

2.    Circuit courts are not citizen boards charged with regulating drainage systems to promote the "physical, economic or environmental management of the county[.]" *See* SDCL 46A-10A-17. Rather, in acting on the applications for drainage permits, the Board prospectively balances the considerations set forth in the statutes and related ordinances to administer the county's drainage plan.

[¶22.]	Here, Lake County adopted drainage ordinances and a permit system and applies its governing water management regulations to its drainage plan to determine whether to grant a permit. In this process, the Board accepts applications for permits, a staff member prepares a report, and the Board holds a hearing on the application. The permit hearing is a meeting in an unbalanced public forum. Therefore, although community members can have their voices heard, the Board's decision to issue a permit is one of policy resting soundly within the discretion of the Board. It exists separate and apart from the Board's role as an adjudicatory body resolving complaints asserting a drainage dispute between neighboring landowners.[3]

---

3.	The dissent argues that our classification of the Board's decision as non-quasi-judicial stands in tension with "prior decisions by this Court holding that prospective determinations may be quasi-judicial when an administrative board is required to apply facts to existing law and the decisions affect the rights of specific individuals." *See* Dissent at ¶ 50.

To support this statement, the dissent looks to *Armstrong v. Turner County Board of Adjustment*, 2009 S.D. 81, 772 N.W.2d 643, in which the Court reversed a board of adjustment's decision to grant a conditional use permit on due process grounds. Although the Court agreed regarding the ultimate result, the decision drew two concurrences. *See id.* ¶¶ 37–40, 772 N.W.2d at 655–56 (Zinter, J., concurring specially); *id.* ¶¶ 41–46, 772 N.W.2d at 656 (Gilbertson, C.J., concurring in result).

Additionally, *Armstrong* cites *Goos RV Center v. Minnehaha County Commissioners*, 2009 S.D. 24, 764 N.W.2d 704 as authority for the standard of review. *Id.* ¶ 10, 772 N.W.2d at 647. In *Troy Township*, we noted that *Goos RV* applied an "internally inconsistent" standard. *See* 2017 S.D. 50, ¶ 19, 900 N.W.2d at 848. We created a new rule in *Troy Township* in order to address this type of confusion.

The dissent also relies upon *Croell Redi-Mix, Inc. v. Pennington County Board of Commissioners*, 2017 S.D. 87, 905 N.W.2d 344. But that case involved whether the circuit court erred in interpreting an ordinance. *Id.*

(continued . . .)

[¶23.]        Further, a review of the relevant statutes and ordinances governing the complaint resolution process reveals that, here, the Board was not acting in a quasi-judicial capacity to resolve a drainage complaint. When a dispute arises between neighboring landowners, Ordinance 4.02 gives an aggrieved landowner the right to file a drainage complaint with the county's administrative official. In such a situation, SDCL 46A-10A-34 provides that the Board may constitute itself as a "board of resolution." Ordinance 4.03 directs the administrative official to investigate the facts of any complaint and offer a recommendation. The official's recommendation is forwarded to the Board for a hearing. If the Board declines to consider the complaint, Ordinance 4.03 and the provisions of SDCL 46A-10A-34 provide that the dispute may be taken to circuit court.[4] If the Board accepts the dispute, a public hearing will be held so the Board can resolve the dispute involving the specific rights of the individuals named in the complaint. The Board's decision may be appealed to the circuit court.

[¶24.]        Aggrieved landowners may also take a drainage conflict directly to the circuit court per SDCL 46A-10A-35, which provides that:

---

(. . . continued)

¶ 26, 905 N.W.2d at 351–52. It did not, as this case does, decide the proper standard of review to apply to the Board's decision to issue a drainage permit. *See id.* Further, reliance on footnote 5 of *Croell* is unpersuasive as it is nonbinding dicta observing the national trend regarding the appropriate standard of review when considering a decision from a local zoning board granting or denying a conditional use permit.

4.    SDCL 46A-10A-34 provides in relevant part: "The board may further provide that specified types or categories of drainage disputes may not be heard by the board of resolution. A drainage dispute which is not within the jurisdiction of the board of resolution shall be taken directly to the circuit court of the county wherein the conflict exists."

> Any decision reached by a commission in order to settle a conflict involving drainage between landowners may be appealed to the board. Any board decision may be appealed or further appealed to the circuit court of the county wherein the conflict arose. An appeal under this section shall be commenced within twenty days of the decision being appealed. *The provisions of this section notwithstanding, landowners may take a drainage conflict directly to the circuit court of the county wherein the conflict exists.*

(Emphasis added). Additionally, Lake County Ordinance 4.01 authorizes a landowner to take a drainage dispute directly to the circuit court.

[¶25.] The dissent suggests *Surat Farms, LLC v. Brule County Board of Commissioners* and *In re Drainage Permit 11-81* support the proposition that the Board's permitting decision was quasi-judicial. *See Surat*, 2017 S.D. 52, 901 N.W.2d 365; *Drainage Permit 11-18*, 2018 S.D. 3, 922 N.W.2d 263. In those cases, however, the circuit court was tasked with reviewing a drainage dispute between landowners. Importantly, in *Surat,* the Board exercised its quasi-judicial power and resolved a drainage *complaint* filed by one landowner against two other landowners. 2017 S.D. 52, ¶¶ 4, 8 n.2, 901 N.W.2d at 367, 368 n.2. Contrary to an application for a drainage permit, the drainage complaint filed in *Surat* "could have been determined as an original action in the circuit court." *Id.* ¶ 11, 901 N.W.2d at 369.

[¶26.] The dissent further relies on *Drainage Permit 11-81*. However, that case involved both an appeal from the Board's permitting decision *and* a drainage dispute between landowners, which was brought as an original action for declaratory judgment and an injunction in circuit court. *Drainage Permit 11-81*, 2019 S.D. 3, 922 N.W.2d 263. We recognize that the circuit court held a trial de novo on the permitting question, but contrary to the dissent's view, *Drainage Permit*

*11-81* is distinguishable. This is because, unlike here, the landowner installed drain tile prior to obtaining a permit, and the disputing landowner alleged existing damage to his property due to the drainage that had already occurred. *Id.* ¶ 4, 922 N.W.2d at 267. Hence, the appeal in *Drainage Permit 11-81* involved a unique set of facts involving the past actions of the landowners—issues not present here— because the Board in this case acted prospectively to authorize installation of drain tile at some point in the future.

[¶27.] It is important to remember that if Steven and Becker damage James's property as a result of their drainage actions, James is free to file an action in circuit court seeking to recover for his injuries. Should the landowners so choose, such filings would not run afoul of res judicata principles. This is because the drainage permitting process, as opposed to the complaint process, does not provide both parties with "a full and fair opportunity to litigate the issues[.]" *See Mendenhall v. Swanson*, 2017 S.D. 2, ¶ 10, 889 N.W.2d 416, 420.

[¶28.] Such an opportunity would require more than holding a meeting in a public forum in which the Board has no obligation to balance a party's burden of proving, by a preponderance of the evidence, reasonably certain damages. *See Rumpza v. Zubke*, 2017 S.D. 49, ¶ 19, 900 N.W.2d 601, 607–08. If a litigant files a drainage complaint seeking damages in circuit court or brings a request for injunctive relief, they must proceed through an adjudicatory process to prove the requisite elements in support of their claim. *See id.*; *Hedlund v. River Bluff Estates,*

*LLC*, 2018 S.D. 20, ¶ 15, 908 N.W.2d 766, 771; *Magner v. Brinkman,* 2016 S.D. 50, ¶ 19, 883 N.W.2d 74, 82–83.[5]

[¶29.]     Further, the inability to have the circuit court review de novo an administrative decision to issue a drainage permit will not, contrary to the dissent's view, result in a multiplicity of lawsuits. The permit proceeding before the Board was not a lawsuit. This is the very reason why prohibiting de novo review of a permitting decision is justified. The Legislature did not vest in courts the power to issue permits, nor should this Court deem such administrative decisions quasi-judicial simply because the result might lead to a separate civil action between two landowners. It is antithetical to maintaining the separation of powers to have a circuit court decide whether to issue a drainage permit. Because, here, the Board's decision to grant the drainage permits was not akin to "the ordinary business of courts," the circuit court did not err when it found that the appropriate standard of review was abuse of discretion and correctly placed the burden of proof on James. *See Troy Twp.*, 2017 S.D. 50, ¶ 21, 900 N.W.2d at 849

---

5.    Temporary injunctions, for instance, require a plaintiff to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Hedlund*, 2018 S.D. 20, ¶ 15, 908 N.W.2d at 771. Permanent injunctions are "authorized only under limited circumstances" and "rest[] in the probability of irreparable injury[.]" *Magner*, 2016 S.D. 50, ¶ 19, 883 N.W.2d at 82–83. A litigant's ability to receive a permanent injunction from a circuit court depends on his ability to show "the causative link between the actions of the defendant and the injury complained of." *Id.* ¶ 19 n.10, 883 N.W.2d at 83 n.10.

>2. *Whether the circuit court erred when it affirmed the Board's decision to issue the drainage permits.*

[¶30.]     James argues that even if the correct standard of review is abuse of discretion, the decision of the Board should be reversed. Our review is limited to "whether the [Board] acted unreasonably, arbitrarily, or . . . manifestly abused its discretion." *Troy Twp.*, 2017 S.D. 50, ¶ 17, 900 N.W.2d at 848. "The arbitrariness standard is narrow, and under that standard, a court is not to substitute its judgment for that of an agency." *Id.* ¶ 33, 900 N.W.2d at 852–53. We reverse findings of fact only when they are clearly erroneous in consideration of the entire record. *In re Jarmen*, 2015 S.D. 8, ¶ 8, 860 N.W.2d 1, 5.

[¶31.]     James contends that the Board erred because when Steven withdrew a portion of his proposal at the hearing, "[a]t the very least, the Board should have required the submission of a new Application, with a new map—identifying the location of any different proposed outlet." He further argues that the Board failed to properly consider the impact upon downstream landowners, particularly when Anderson recommended approval without providing information relating to any potential detrimental impact caused by the projects. Specifically, he maintains that the proposed projects will both increase the volume of water on his property and extend the amount of time water flows onto his property.

[¶32.]     The Board argues that it properly considered the relevant evidence and made its decision after considering James's arguments regarding the impact of the drain tile projects on his property. The Board also contends that although it approved Steven's permit without requesting a new application, its decision was not

arbitrary because the same notice would have been required for a project involving less tiling.

[¶33.] Under the deferential standard of review applicable here, we cannot say that the Board abused its discretion in approving either drainage permit. The Board considered the evidence in light of the ordinance and SDCL 46A-10A-20 to determine whether the proposed projects would cause an unreasonable hardship to James's property. This evidence included Anderson's staff reports, the packets received before the hearing, and the testimony and exhibits presented during the hearings. Notably, the recommendations in Anderson's staff reports echoed the considerations of SDCL 46A-10A-20 and indicated that the applications were reviewed with these factors in mind. SDCL 46A-10A-20 provides:

> Official controls instituted by a board may include specific ordinances, resolutions, orders, regulations, or other such legal controls pertaining to other elements incorporated in a drainage plan, project, or area or establishing standards and procedures to be employed toward drainage management. Any such ordinances, resolutions, regulations, or controls shall embody the basic principle that any rural land which drains onto other rural land has a right to continue such drainage if:
> (1) The land receiving the drainage remains rural in character;
> (2) The land being drained is used in a reasonable manner;
> (3) The drainage creates no unreasonable hardship or injury to the owner of the land receiving the drainage;
> (4) The drainage is natural and occurs by means of a natural water course or established water course;
> (5) The owner of the land being drained does not substantially alter on a permanent basis the course of flow, the amount of flow, or the time of flow from that which would occur; and
> (6) No other feasible alternative drainage system is available that will produce less harm without substantially greater cost to the owner of the land being drained.

While Anderson's recommendations to the Board were identical for each permit application, we cannot conclude that this means the Board abused its discretion, because our review of the record establishes that the Board considered the unique circumstances of each application during the hearings.[6]

[¶34.]     Anderson testified about the general process she follows to prepare her staff reports.  This, according to her testimony, involves compiling information from various sources relevant to each application.  As part of this process, she conducts field visits and often views the properties from the adjacent road if crops do not obstruct her view.  She also reviews the history of the area, wetland information from the Natural Resource Conservation Service, and the proposed drain tile plan itself.  As part of her review process, she ensures that the applicant uses the least amount of drain tile possible to accomplish the desired drainage plan.

[¶35.]     By comparing the tile map and the wetland map, she determines whether the tile is draining wetland or "moving water from another watershed." Her determination that a proposed project will not create an "unreasonable hardship," as she concluded for the Steven and Becker permits, is based on this comparison.  If she finds that the project is not draining a wetland or another

---

6.     For both permits, Anderson recommended that the Board find that: (a) the land receiving the water will remain rural in character and this new drain tile will not create unreasonable hardship or injury; (b) the land being drained is being done in the smallest amount to increase the yield of future crops and will improve soil erosion and, therefore, is a reasonable request; (c) the proposed drain tile will not alter the current watercourse; and (d) the proposed drain tile is the minimum tile plan that will make possible the reasonable use of the land.

watershed not part of the established watercourse, she concludes that the recipient property will not receive more water than is typical. However, Anderson stated that based on this method of evaluation, she is unable to determine whether water will flow onto a property for a longer period of time. She does not make recommendations based on that criterion for this reason. Accordingly, she acknowledged there was no data submitted for either permit indicating changes to the timing of the water flow.

[¶36.]     Prior to a hearing, Anderson provides each Board member with a packet containing her report and the information she has gathered as part of her investigation. For Steven's and Becker's applications, she provided the Board with plats of the affected parcels noting the watercourse, drain tile plans, certified wetland maps, as well as other relevant historical information related to the specific properties. Additionally, the Board had the benefit of information presented at the public hearings to supplement the application materials.

[¶37.]     James presented his arguments to the Board at both hearings. He expressed concern that the watercourses did not have sufficient additional carrying capacity. He further argued that the projects could increase the volume of water coming onto his property and it would flow for a longer time. The Board discussed the potential effects of the project for nearly an hour. This discussion included the possibility that water could back up and pool on James's and Halverson's properties due to obstructions on Olson's property to the north, making farming difficult on their land. Despite these concerns, the Board determined the tiling would not create an unreasonable hardship. The Board also advised James and Halverson of

their right under the ordinance or state law to submit a drainage complaint to the Board if Olson's blocked ditches posed a further problem for them.

[¶38.]    Regarding James's claim that the Board mishandled Steven's application, we agree that Steven's application presented an unusual scenario. Anderson's staff report failed to address the fact that Steven was proposing to install drain tile on James's property without any authority to do so. While she testified at trial that she knew Steven did not produce any documentation that James consented to the project, she recommended approval because the Board could consider the matter at the public hearing, and there was "always hope that landowners can work something out between each other." The matter was addressed at the Board hearing, and Steven withdrew his plans to extend his project onto James's property. Steven said that he would install the outlet somewhere on James's fence line if he could not get permission from James. But, the Board did not conclude at the hearing exactly where the new outlet would be before approving the project.

[¶39.]    Despite this deficiency, the Board properly considered Steven's permit as a whole. Under the drainage ordinance, an applicant is only required to clearly identify an outlet on a tile plan in the initial application. Steven complied with this requirement. Nothing in the ordinance appears to require the Board to deny Steven's permit in the event the outlet location is changed as the result of discussion at a public hearing. Nor does it appear that the ordinances require new notice be given for a shorter tile project involving the same landowners.

[¶40.]     Finally, James has failed to establish that the circuit court's factual findings were clearly erroneous. Because the Board's actions demonstrate that it acted within its authority based on relevant and competent evidence, we conclude that the Board did not abuse its discretion in granting the permits.

**Conclusion**

[¶41.]     The circuit court applied the correct standard of review to James's appeal of Steven's and Becker's drainage permits. Furthermore, the Board did not abuse its discretion in granting the permits. The circuit court's decision is affirmed.

[¶42.]     GILBERTSON, Chief Justice, and WILBUR, Retired Justice, concur.

[¶43.]     JENSEN and SALTER, Justices, dissent.


JENSEN, Justice (dissenting)

[¶44.]     The majority opinion mistakenly concludes the Board's decisions on the two drainage permit applications are quasi-legislative. Rather, each application was quasi-judicial in nature as it sought permission to install a drain tile system on the property of a single landowner and required the Board to make a determination on drainage rights as between the applicant and the downstream landowner. In considering the applications, the Board applied the civil law rule[7] to the facts before

---

7.     State law and the County's drainage ordinance required the Board to apply the civil law rule to consider the reasonableness of the proposed drainage. In authorizing drainage management by county drainage boards in SDCL ch. 46A-10A, the Legislature codified the civil law rule in SDCL 46A-10A-20. The civil law rule burdens a downstream rural landowner "with an easement under which the dominant, or upper property owner may *reasonably* discharge surface water over the servient estate through natural watercourses." *Knodel v. Kassel Twp.*, 1998 S.D. 73, ¶ 10, 581 N.W.2d 504, 507 (emphasis added). The courts in this state have applied the civil law rule

(continued . . .)

the Board to determine whether the installation of the drain tile was reasonable, and whether the neighboring landowner would be unreasonably harmed by the installation of the tile.

[¶45.]     Our test from *Troy Township* leads to the conclusion that the Board's decisions on the two drainage permit applications were quasi-judicial:

> Administrative action is quasi-judicial if it investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist rather than looking to the future and changing existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power.

2017 S.D. 50, ¶ 21, 900 N.W.2d 840, 849 (citations omitted) (internal quotation marks omitted).

[¶46.]     The permit applications bore all the earmarks of a drainage dispute between individual landowners, and more importantly, determined the drainage rights as between two individual landowners.  Both applicants (Steven Carmody and Edward Becker) presented current and historic drainage information, and the specifications of the drainage systems, to support their claims that the proposed drainage was reasonable.  In objecting to the permits, James Carmody claimed the proposed tiling would cause unreasonable harm to his property.  He supported this claim by presenting the historic water flows, and past flooding events on his property.  The Board approved the applications, concluding that the proposed drainage systems were reasonable and would not cause unreasonable harm to

---

(. . . continued)

> to resolve rural drainage disputes between landowners for more than a century.  *See Thompson v. Andrews*, 39 S.D. 477, 165 N.W. 9, 11 (1917); *Quinn v. Chicago, M. & St. P. Ry. Co.*, 23 S.D. 126, 120 N.W. 884, 886 (1909).

James Carmody's property. The Board's decisions were based upon factual investigations and legal conclusions from existing law, that adjudicated the rights and liabilities of these parties concerning the disputed drainage systems.[8] *See Surat Farms,* 2017 S.D. 52, ¶ 11, 901 N.W.2d 365, 369 (applying de novo review to a county board's consideration, under the civil law rule, whether the drainage system of a downstream landowner unreasonably interfered with the drainage rights of an upstream landowner).

[¶47.]     The majority opinion suggests that county drainage permit decisions are not quasi-judicial because courts do not consider drainage permit applications. In my view, this mischaracterizes our holding in *Troy Township* by focusing on the *type* of proceeding rather than the *nature* of the issues and decisions made by the administrative board. The proper inquiry is not whether an administrative board has exclusive, original jurisdiction over the particular proceeding. Rather, in *Troy Township* we stated, "that which *resembles* what courts customarily do is judicial, and that which has no such resemblance is nonjudicial."[9]  2017 S.D. 50, ¶ 21, 900

---

8.     While prospective in nature, the reasonableness determinations by the Board were in fact assessments of the liabilities as between two property owners. "The landowner, however, becomes liable when his harmful interference with the flow of surface waters is unreasonable." *Strong v. Atlas Hydraulics, Inc.,* 2014 S.D. 69, ¶ 22, 855 N.W.2d 133, 142 (internal quotation marks omitted).

9.     Our decision in *Troy Township* carefully traced judicial recognition of quasi-judicial acts to our Territorial days when the Territorial Court described them as "those that could have been 'determined as an original action in the circuit court.'" 2017 S.D. 50, ¶ 21, 900 N.W.2d at 849 (quoting *Champion v. Bd. of Cty. Comm'rs of Minnehaha Cty.*, 5 Dakota 416, 430, 41 N.W. 739, 742 (1889)). *Troy Township* then identified that "[p]erhaps as good a criterion as any for determining what is judicial" involves a comparison of "the action in question with the ordinary business of courts: that which resembles what

(continued . . .)

N.W.2d at 849 (emphasis added). Here, both permit decisions resolved the questions of the reasonableness of the installation of drainage tile and the impact of the tile on a downstream landowner. This is the identical determination a court would make in considering whether to grant an injunction before the installation of the tile, or to impose damages after the tile is installed. *See Knodel*, 1998 S.D. 73, 581 N.W.2d 504 (entertaining an action seeking injunctive relief to prevent a township from unplugging a culvert that a downstream landowner claimed would result in damage to his property); *Winterton v. Elverson*, 389 N.W.2d 633, (S.D. 1986) (considering an action for damages by a downstream landowner claiming the installation of a drain tile by the upstream landowner unreasonably increased the natural drainage).

[¶48.]        *Troy Township* held that the vacation of public highways by several township boards were not quasi-judicial decisions. 2017 S.D. 50, ¶ 22, 900 N.W.2d at 849. *Troy Township* correctly concluded that the nature of the issues and decisions by the townships in vacating the public right of ways were a public policy decision that "did not adjudicate existing rights of specific individuals." *Id.* "The question decided by the Townships . . . was whether the public interest would be better served by vacating the highway segments." *Id.* Here, the defining issues involved drainage rights between individual landowners and the claim of unreasonable harm to the downstream landowner. In deciding that the proposed drainage was reasonable, the Board unquestionably adjudicated existing rights of

---

(. . . continued)
        courts customarily do is judicial, and that which has no such resemblance is nonjudicial." *Id.* (citations omitted).

specific individuals. The Board was not presented with, and did not decide, any broader policy issues beyond the impact of the drainage on the individual landowners.

[¶49.] The majority opinion states that "[w]hether an action is quasi-judicial is a fact-based inquiry undertaken on a case-by-case basis." *See* ¶ 17, supra. Rather than undertake such a review here, the majority opinion determines drainage permit applications can never be quasi-judicial determinations. It is possible that a drainage permit application could involve policy or quasi-legislative principles that are not reviewable de novo, but that is not the circumstance before us today. What we have before us today is a drainage permit application that required the Board to determine drainage rights as between two landowners.

[¶50.] The majority opinion also suggests that prospective decisions by administrative boards, including permitting decisions, cannot be quasi-judicial in nature. This ignores the test from *Troy Township*, but also stands in tension with prior decisions by this Court holding that prospective determinations may be quasi-judicial when an administrative board is required to apply facts to existing law and the decisions affect the rights of specific individuals. In *Armstrong v. Turner Cty. Bd. of Adjustment*, 2009 S.D. 81, ¶ 19, 772 N.W.2d 643, 650–51, this Court determined the "decision to grant or deny a conditional use permit" under a county zoning ordinance was quasi-judicial. While conditional use permits are authorized by statute and zoning ordinances, we recognized that "[t]he nature of the evaluation and approval as it applies to specific individuals or situations is quasi-judicial." *Id.*

[¶51.]    Citing *Troy Township*, we recently reaffirmed this holding in *Croell Redi-Mix, Inc. v. Pennington Cty. Bd. of Comm'rs*, 2017 S.D. 87, ¶ 26 n.5, 905 N.W.2d 344, 351 n.5. *Croell* considered a decision by a county commission denying an application for a construction permit that sought to continue and allow for future expansion of a mining operation. *Id.* ¶¶ 4-6, 905 N.W.2d at 346-47. The Court applied de novo review of the permit decision because the county commission's decision was quasi-judicial.[10] *Id.* ¶ 26 n.5, 905 N.W.2d at 351 n.5.

[¶52.]    More recently, we again relied on *Troy Township* to affirm a circuit court's de novo review of a county commission's decision to grant two drainage permits. *See In re Drainage Permit 11-81*, 2019 S.D. 3, ¶ 15, 922 N.W.2d 263, 269. The majority opinion does not provide any meaningful distinction between this case

10.    *Croell* cited cases from other jurisdictions holding that amendments to zoning ordinances are legislative in nature, but decisions involving variances and conditional use permits are quasi-judicial, even when such applications are considered prospectively:

> *Arnel Dev. Co. v. City of Costa Mesa*, 28 Cal. 3d 511, 169 Cal. Rptr. 904, 620 P.2d 565, 569 (1980) (en banc) ("Zoning amendments are legislative, but administrative decisions, such as variances and use permits, are adjudicative."); *Mustang Run Wind Project, LLC v. Osage Cty. Bd. of Adj't*, 387 P.3d 333, 345 (Okla. 2016) ("A board of adjustment deciding an application for a variance or a conditional use does not exercise a legislative power in changing a zoning ordinance, but exercises a quasi-judicial power based upon the facts presented to the board."); *Chioffi v. Winooski Zoning Bd.*, 151 Vt. 9, 556 A.2d 103, 106 (1989) ("Zoning boards, in ruling on applications for special exceptions to a zoning ordinance, perform quasi-judicial functions."). "In the instant case, the Board was performing a quasi-judicial function in determining the applicability of a valid county zoning ordinance to the facts of the case, i.e., in applying the law to the facts." *Chioffi*, 556 A.2d at 106.

2017 S.D. 87, ¶ 26 n.5, 905 N.W.2d at 351 n.5.

and *Drainage Permit 11-81*.[11] The majority opinion disregards the fact that there were two drainage permit applications under consideration in *Drainage Permit 11-81*. The first application involved a permit seeking approval of two existing drain tile systems. However, the second application, like the applications here, sought prospective approval to install additional tiling. We made no distinction between the retrospective and prospective nature of the permit applications. Instead, the common denominator for determining the standard of review in *Drainage Permit 11-81* was that both permit applications required the county to determine whether the drainage was reasonable, or would cause unreasonable harm to the downstream landowners. Like this case, the decision to grant or deny the permits in *Drainage Permit 11-81* required the county commission to apply existing law to the facts to adjudicate the drainage rights between the two landowners. The permit decisions only implicated the property rights of the affected landowners, and did not involve broader policy concerns.

[¶53.] In a tacit admission that the determination of water drainage rights between individual landowners is quasi-judicial, the majority opinion suggests that landowners dissatisfied with drainage permit results may re-litigate the exact same reasonableness determinations already made by a county board. The majority opinion states if James's property suffers damages as a result of the county approved drainage tile, "James is free to file an action in circuit court seeking to recover for his injuries." *See* ¶ 27, supra. Initially, this idea is troubling because it

---

11.    The fact that there were other separate damage claims in *Drainage Permit 11-81* for past flooding events had no bearing on the standard of review for the permit applications.

encourages multiple actions and the potential for inconsistent results. Under this premise, the legislatively-created permitting process would be rendered completely useless and provide no certainty to landowners who may spend thousands of dollars to install an approved drainage system. The notion is also confounding because it allows for a situation in which a court reviews a purportedly quasi-legislative decision anyway, just later in a separate civil action. What possible justification would preclude de novo review of a county drainage board's decision determining the reasonableness of a drainage system between two landowners, only to allow it later as an independent civil action?

[¶54.]        By way of example, consider a situation in which a county drainage board issues a permit over the objection of a downstream landowner, determining under the civil law rule that the installation of drainage tile was reasonable. The circuit court, conducting only a limited abuse of discretion review, affirms the decision after finding it neither arbitrary nor capricious. Twelve months later, the downstream landowner commences a civil action against the owner of the dominant estate, alleging the use of the very same drainage tile is unreasonable and violates the civil law rule of drainage. The trial court agrees, grants the downstream landowner's request for injunctive relief, and orders the dominant estate owner to remove the previously-permitted drainage system that was, under the majority opinion's view, the product of a quasi-legislative decision. This is precisely what *Troy Township* sought to prevent, unless the issues we are being asked to review today truly are quasi-judicial and fully reviewable by the courts.

[¶55.]     I agree with the majority opinion that a full and fair opportunity to litigate an issue requires "more than holding a meeting in a public forum in which the Board has no obligation to balance a party's burden of proving, by a preponderance of the evidence, reasonably certain damages." ¶ 28, supra. This is precisely why county board decisions resolving drainage rights between property owners are quasi-judicial and are properly reviewed de novo under *Troy Township*. The majority opinion never questions that the very issues resolved by the Board *in this case* involved the application of the civil law rule to determine the reasonableness of the drainage systems as between adjoining landowners. These are the same issues that the courts have heard and resolved since before statehood. We should not back away from our constitutional authority and responsibility to continue to review and adjudicate such issues.

[¶56.]     Here, the circuit court determined that the Board's permit decisions were not quasi-judicial and applied the deferential abuse of discretion standard of review. The court erred in this determination. The circuit court received evidence and made findings of fact and conclusions of law, but only deferentially reviewed the determinative questions of the reasonableness of the drainage, and likelihood of unreasonable harm to James Carmody. Similarly, the court applied the same deferential standard of review to Steven Carmody's modification of his drainage outlet, and the failure to provide an amended site plan with a new location for the outlet. I would remand both permit applications to the circuit court for de novo review of the Board's decisions granting the permit applications.

[¶57.]     SALTER, Justice, joins this dissent.